[L. A. No. 14916. In Bank.—February 29, 1936.]

INYO CHEMICAL COMPANY (a Corporation), Respondent, v. CITY OF LOS ANGELES (a Municipal Corporation) et al., Appellants.

Erwin P. Werner and Ray L. Chesebro, City Attorneys, Mark L. Herron and J. M. Stevens, Assistant City Attorneys, K. K. Scott, A. A. Scott, Harold L. Green and Russell B. Jarvis, Deputies City Attorney, and Jess E. Stephens, Special Counsel, for Appellants.

Young, Lillick, Olson, Graham & Kelly, E. L. Searle and E. R. Young for Respondent.

LANGDON, J.—A hearing was granted in this case, after decision by the District Court of Appeal, Fourth Appellate District, in order that we might consider it in connection with the case of *Southern Pacific Co.* v. *City of Los Angeles*, L. A. No. 14610, *post*, p. 545 [55 Pac. (2d) 847], then pending in this court. Upon a full consideration of the record and briefs in both cases, and after further argument by counsel, we believe that the said District Court of Appeal has correctly determined the major issues of the case, and we accordingly adopt the following opinion of Mr. Presiding Justice Barnard as part of the opinion of this court:

"This is an action for damages alleged to have been sustained by the plaintiff through and because of the breaking of an aqueduct maintained and operated by the defendants.

"This break occurred in what is known as the Los Angeles aqueduct, which was completed about the year 1913 and which is operated by the defendants for the purpose of conveying waters from the Owens river, together with other waters, to the City of Los Angeles. In what is known as the Olancha division, in which this break occurred, the aqueduct is an open, cement-lined canal approximately thirty-five feet wide at the top, twelve feet deep and eleven feet wide at the bottom. This section of the aqueduct is constructed along and upon the easterly slope of the Sierra Nevada mountains which, immediately west of this portion of the aqueduct, rise to an elevation of from 8000 to 13,000 feet. The aqueduct was designed to carry waters from the Owens river and also such waters flowing down the easterly slope of these mountains as might be intercepted and caught thereby, various openings being constructed in the upper or westerly bank of the aqueduct to facilitate the inflow of such waters. The flood and surface waters flowing down the easterly slope of these mountains, thus intercepted by the aqueduct, carry certain amounts of sand, silt and debris during times of heavy rainfall which are deposited in the bottom of the canal, reducing its capacity to some extent. No provision was made for keeping such deposits out of the canal, but at appropriate intervals the water was shut off and the accumulated debris removed. At some of the larger creeks spillways were constructed to carry flood waters over the aqueduct, one of these being at Cottonwood creek, about three and one-half miles north of where the break occurred. Gates were provided at the intake on Owens river by which all water could be shut off from the aqueduct, and provision was also made at certain points for spilling all water in the aqueduct into natural creek beds, one of these being at Cottonwood creek. The aqueduct was designed to have a capacity of 900 second feet at hydraulic grade line, which is fifteen inches below the top of the aqueduct, and 1115 second feet at the top of the concrete lining. The intervening space of fifteen inches was intended to provide a safety factor to take care of any water coming down the slope of the mountain which might be intercepted. However, the defendants' rating tables disclose that

the actual working capacity of the aqueduct near Cotton-wood creek was 654 second feet at hydraulic grade and 875 second feet at the top of the concrete lining. There is evidence that this actual lower capacity was caused by the fact that there are 1800 degrees of curvature in the aqueduct in the three and one-half miles next above where the break occurred, and that this resulted in such a slow movement of the water at this point that its velocity was not sufficient to move any sand or gravel which came in from above.

"Immediately to the west of this section of the aqueduct there are a number of so-called canyons extending down the face of the steep easterly slope of these mountains. Below each of these canyons there is what is called a 'cone', consisting of a large mass of sand, gravel and rocks which in times past has been washed out of the canyon above it. Each cone has its apex at or near the mouth of its respective canyon and spreads out in a fan-shaped manner on down the slope. These cones vary in size and area and the canyons above them also vary in steepness and in drainage area. In its route along and upon the easterly slope of these mountains this aqueduct crosses many of these cones, including the one involved in this action, which is called 'Cone A', being immediately below what is termed 'Canyon A'. The aqueduct was built over Cone A at a point several hundred feet below its apex and is somewhat in the form of a semicircle as it passes around the sloping sides of the cone.

"The plaintiff operated a manufacturing plant at Cartago, near the southerly end of Owens lake and a short distance easterly from and below the point where the break in the aqueduct occurred, in which it produced calcined trona and a refined soda ash. Owens lake has no outlet and the waters thereof are saturated with certain mineral substances. As the waters in the lake had lowered sodium bicarbonate or sodium hydrate, in a form called trona, was deposited on certain portions of the lake bed from which the water had receded. The plaintiff had leased from the state of California some 1300 acres of land along the shore of Owens lake, apparently part of the tract being covered by waters of the lake. Under this lease it was required to pay to the state an annual rental of $2.50 per acre and, in addition, to pay a royalty of 50 cents for each ton of trona removed and a royalty of 25 cents for each ton of any other product removed

or taken from the water or land. In conducting its business the plaintiff gathered dry trona from certain portions of the land which were not covered with water, hauled this trona to its plant on roads which it had constructed and, after processing the same, sold the same as refined trona. It also pumped brine from the highly concentrated waters of the lake itself through a pipeline to its plant, using the material to manufacture soda ash. The brine thus pumped to the plant was also strengthened by adding thereto quantities of the dry trona which was taken from the banks of the lake. The deposit of dry trona varies in thickness and in purity and in some places was covered by or mixed with sand, but at one place on the lease there was an area of about 130 acres containing an especially thick deposit of high-grade trona.

"A heavy rainfall began in the Owens valley on November 24, 1926, and continued at intervals until the morning of the 27th, being slightly heavier at a point three and one-half miles of Cone A than at Independence, which is thirty miles north of this cone, and being particularly heavy during the last twenty-four hours of the storm. Sometime during the night of the 26th–27th the water coming out of Canyon A and flowing down Cone A extended and deepened a gully which had existed on the face of the cone and washed some 7000 cubic yards of sand, gravel and debris into that part of the aqueduct traversing this cone, with the result that the water in the aqueduct backed up and overflowed, washing out the foundations of the aqueduct and causing it to collapse and break. About 500 feet of the aqueduct was washed out and the combined waters flowed on down the slope of the cone scouring out a channel some three hundred or four hundred feet in width, and passing over a portion of plaintiff's lease and on into Owens lake. Large quantities of dry trona were washed out and destroyed and other portions of the trona deposit were covered with sand and debris, in some places to a depth of several feet. The plaintiff brought this action to recover damages for the injury done to its trona beds and to certain of its roads, pipelines and power lines, and for its increased cost of operation during the time certain repairs were made. After a trial before the court without a jury, judgment was entered in favor of the plaintiff for $236,251.96, from which judgment the defendants have taken this appeal.

"While the transcripts contain about 2300 pages, printed briefs totaling about 3200 pages have been filed, supposedly for the assistance of the court, and it is neither practicable nor necessary to treat and comment upon, in detail, all of the matters thus presented.

"With respect to their liability in general, the appellants contend that the court's findings of negligence on their part in constructing, maintaining and operating the aqueduct are without support in the evidence. The court made a number of findings in this regard, including the following, which are particularly attacked:

" 'The court finds that the defendants were negligent in the construction of the aqueduct or canal owned and operated by them, as hereinbefore described, in that they failed to construct necessary or proper spillways to carry storm or surface waters, which might reasonably be expected to fall upon the mountain slopes westerly of said canal or aqueduct, over and across or under said aqueduct or canal, and particularly that they were negligent and careless, and failed to exercise due care in the construction of said aqueduct in that they failed to make any provision, either by overhead or underground spillways or conduits in that certain canyon referred to and described in the evidence and testimony introduced in this case as Canyon "A", to carry storm or surface waters which might reasonably be expected to fall on the watershed above said Canyon "A", over or under said canal or aqueduct, or to make provision so that such storm or surface waters carrying sand, gravel, silt and rocks would not be emptied into said canal.'

" ' . . . the court further finds that defendants were negligent in the maintenance, care and operation of said canal or aqueduct in that defendants knew, or should have known from experience gained by the operation of said canal from the period extending from about the year 1913 to November 26, 1926, that heavy rains falling upon said mountain slopes westerly of said canal or aqueduct would cause storm or surface waters to flow down said slopes and into said canal or aqueduct, and would carry with them sand, silt, rocks and debris, and empty the same into said canal or aqueduct unless spillways or conduits were constructed to carry said surface waters and said sand, silt and rocks over or under said aqueduct or canal, and that defendants knew, or should have

known if such storm or surface waters flowed into or were emptied into said canal or aqueduct and carried with them sand, silt, rocks or debris, they were likely to fill, or partially fill, said aqueduct or canal and cause the flow of water being maintained in said canal or aqueduct by said defendants, to be dammed up and to back up and overflow the easterly bank of said canal or aqueduct, and to wash away the fill or embankment upon which said canal or aqueduct was constructed, and to undermine the same, and the court finds that said defendants were particularly negligent in the maintenance, care and operation of said canal or aqueduct in that they failed to construct any spillway or conduit over or under said canal or aqueduct opposite or below that certain canyon referred to, described and testified to as Canyon ''A'' in the testimony and evidence introduced in this case and that defendants were negligent in that they knew, or should have known, if said canal or aqueduct became undermined and collapsed that the waters flowing therein would flow down and upon, and be precipitated upon the bed of Owens lake, and would deposit soil, silt, sand and debris upon the leasehold owned, operated and controlled by plaintiff; that defendants were negligent and careless, and failed to exercise due or proper care in the maintenance and operation of said canal or aqueduct in that they did not maintain a proper or sufficient patrol or guard, and did not maintain adequate or sufficient inspection of said canal or aqueduct during the period of heavy rainfall that continued from November 24th to the morning of November 27th, 1926; . . . '

■ ''It is argued that the only evidence appearing in the record which could possibly be taken as supporting a finding of negligence on the part of the appellants consists in the answers given by two expert witnesses to hypothetical questions asked of them, which evidence was improperly admitted since the form of the questions was improper and, further, that it conclusively appears from the evidence that the break in the aqueduct which resulted in this action was caused by such an unusual flow of water out of Canyon A and down Cone A that the same must have come from such a cloudburst or unusual rain as could not have been anticipated by the appellants and which must be held, as a matter of law, to have constituted an act of God and one for which the appellants

cannot be held responsible. We are unable to agree with either of the contentions thus made.

"While it appears from the evidence that the ordinary rainfall in the Owens valley is light, it also appears that this area, including the easterly slope of the mountains along which this aqueduct runs, is subject to torrential rains at times; that such rains are especially heavy in spots; and that the places or spots where the rain is unusually heavy vary with the different storms.

"According to the government records kept at Independence, thirty miles north of where the break occurred, it rained 1.12 inches on November 24, 1926; 2.51 inches on the 26th and 1.06 inches on the 27th. According to records kept by the appellants at their Cottonwood creek gate, about three and one-half miles north of this break, their gauge showed .18 of an inch of rainfall on the morning of November 24, 1926, 1.79 inches on the morning of the 25th, .35 on the morning of the 26th, and 2.78 inches on the morning of November 27th. It should be noted that these last figures are from morning to morning of the respective days, while the preceding government figures are from midnight to midnight. With this in mind, while the rainfall during this storm may have been somewhat higher at the point where the break occurred than at Independence, it does not necessarily appear that the difference was very great. The total for the storm at Independence was 4.68 inches, while the total at the Cottonwood gate was 5.01 inches. A number of witnesses testified that the heaviest rainfall during this storm occurred during the afternoon and evening of the 26th and the early morning hours of the 27th, and that while it was a very heavy rain it was no heavier than they had seen at that place several times in the past. It appears from the government records of rainfall at Independence that in December, 1867, it rained 3.90 inches on the 21st and 22d, 1.60 inches on the 23d and 5.59 inches within a period of twenty-nine hours on the 25th and 26th, and there was a total rainfall of 12.19 inches during that month. During January, 1868, it rained 3.05 inches on the first and 1.04 inches on the 10th. During January, 1914, it rained 1.33 inches on the 24th and 3.51 inches on the 25th. The government records thus disclose that the rainfall at Independence on November 26, 1926, had been exceeded on four days since the government records were kept.

The respondents argue, however, that it conclusively appears that a rainfall occurred on the night of the 26th–27th at Canyon A very greatly in excess of any that had ever occurred there before, since on this occasion the water coming from Canyon A washed great quantities of sand and gravel from Cone A into the aqueduct for the first time since it was constructed. It neither appears that the rain in question was heavier at this point on this occasion than had occurred there before the aqueduct was constructed, nor, necessarily, that it was heavier than the one in January, 1914. The manner in which rain fell, the condition of the cone at the time, the form of the gully already on the face of the cone, the manner in which the material had settled through the years, and many other things may have led to the concentrated washing and caving which occurred on this occasion.

"It is also argued that this rainfall in Canyon A must have been greater than in the surrounding area since the drainage area in Canyon A is smaller than that in adjoining canyons, since Cone A is smaller in area than some of the cones near by, and since no such a slide or fill then occurred at the other cones crossed by the aqueduct. Not only is there testimony from witnesses justifying the inference that the rainfall at the point in question was not noticeably greater than in the surrounding country, but the fact that such a wash then occurred here for the first time, and here only, does not conclusively show that a very unusual amount of rain fell at that time in Canyon A only. While it appears that the drainage area of Canyon A and the area of Cone A are smaller than some other similar canyons and cones below and over which the aqueduct passes, it also appears that Canyon A is steeper than the others, that its walls and sides and practically all of its drainage area consists, to a large extent, of light loose material and that Cone A stands apart from other cones in the vicinity as being composed of lighter material, light sand and gravel and fewer and smaller rocks. Not only is it possible that such lighter material would wash more easily than cones composed of heavier material but the fact that this cone had been thoroughly soaked during the preceding two days, with the added steepness and narrowness of its canyon, and the fact that there was already a channel on the face of the cone, at least near the mouth of the canyon, may have concentrated the water and started the loose sand to

slipping while larger cones near by may have absorbed and spread a larger amount of water without starting a concentrated erosion. When water once starts to cut a soft material the cutting is often rapid. There is some evidence that the condition and position of this cone and canyon were different from its neighbors and it cannot be said that the only possible inference to be drawn from the thing that happened is that the rainfall in that particular spot was enormously greater than that on either side. It further appears that the appellants had knowledge of and had studied the available rainfall records and they are to be charged with knowledge that unusual rains occurred in this vicinity and that they vary in intensity at different places. If it may be assumed that the trial court could have found to the contrary, it cannot be said that there is no evidence to sustain the court's finding that this storm was not so unusual as not to have been anticipated by the appellants and that it was not of such proportions as to constitute what may be termed 'an act of God' in the legal sense.

"The question of the appellants' negligence in constructing and maintaining this aqueduct should be considered in connection with the fact that such a storm as the one here in question should have been anticipated by them. Under such circumstances this aqueduct was constructed for a distance of several thousand feet across this cone of unusually light material, and there is evidence that it was constructed by cutting down to grade on the slope of this cone through this light material and leaving on the uphill side of the aqueduct a perpendicular wall of sand and gravel standing four feet above the top of the west side of the aqueduct, from which point the cone sloped on up to its apex at a grade of between 20 per cent and 25 per cent. In other words, this mass of sand, gravel and light material stood immediately above the aqueduct, with its lower edge standing four feet directly above the side of the same, and with nothing to take care of any water or material that might come down. Not only would any water that got started down this cone in a definite channel have a colossal carrying capacity, as testified by one of the engineers, but the very condition in which this cone was left, in itself, justifies a finding of negligence. A number of photographs showing the actual conditions at this point appear in the record and these, in themselves, fur-

nish sufficient evidence to support the findings attacked. There was also evidence that about the time the aqueduct was completed it was completely filled in for more than half a mile a short distance below the point where this break occurred, that near the same point it was again filled in 1914, that it was completely filled with sand and debris from flood waters in 1921, and that at various times between 1812 and 1926 it was partially filled by rock, gravel and sand falling in from these slopes. The appellants argue that evidence of such fills at other times and places is of no value because a fill had not before occurred at the identical spot involved here. This contention is without merit and this evidence tends to support the finding made.

"The appellants contend that the question of negligence with respect to the manner in which this aqueduct was constructed and maintained was entirely a question to be decided upon the testimony of expert witnesses and that the only material evidence upon this point which is properly in the record, consisting in the answers to hypothetical questions given by several expert witnesses put on by the appellants, is directly contrary to the court's findings. It is contended that none of the respondent's evidence on the question of negligence is material except for two hypothetical questions asked of engineers placed on the stand by the respondent. It is then argued that the evidence of these two engineers was inadmissible because of the form of the question asked of each and that there is, therefore, no evidence in the record to sustain the finding of negligence. The hypothetical question asked of respondent's two engineers, after stating the general facts and circumstances disclosed by other evidence, concluded as follows:

" ' . . . state whether in your opinion it was safe and prudent to construct said aqueduct of the dimensions and character and at the location mentioned, without providing means for carrying the drainage water (and) debris which might be expected to flow from said canyon west of the point where the fill occurred, so that such drainage water and debris would not be deposited in said aqueduct, state whether or not in your opinion it was safe?'

"To this question one of the witnesses answered no, and the other witness answered as follows:

" 'In my opinion it was imprudent and not good engineering. If the locating engineer was forced by some unknown reasons to me, to locate an open aqueduct across all these debris cones you have mentioned, and at the mouth of all the canyons you have mentioned, he should have provided for not only to protect the aqueduct by frequent overhead crossings, but in some places to protect the aqueduct by covering the same. That is based on my knowledge also of the country alongside and through which the aqueduct runs from Alabama Hills to below Little Lake.'

"It is appellants' contention not only that the question of negligence depended entirely upon expert evidence, but that the form of the question asked of these witnesses took away from the trier of fact the ultimate fact to be decided and that the court, therefore, erred in permitting the questions to be answered. It is argued that the witnesses should have been asked whether the manner of construction indicated was in accordance with good engineering practice, and not whether it was safe and prudent under the circumstances. In support of this contention the appellants rely upon the following cases: *Sappenfield* v. *Main Street R. R. Co.*, 91 Cal. 48 [27 Pac. 590]; *Giraudi* v. *Electric Imp. Co.*, 107 Cal. 120 [40 Pac. 108, 48 Am. St. Rep. 114, 28 L. R. A. 596]; *Luman* v. *Golden Ancient Channel Min. Co.*, 140 Cal. 700 [74 Pac. 307]; *Parkin* v. *Grayson-Owen Co.*, 157 Cal. 41 [106 Pac. 210]; *Mulholland* v. *Western Gas Constr. Co.*, 21 Cal. App. 44 [131 Pac. 110].

"It may first be observed that no objection was made to the form of the question when it was asked of the second expert witness put on by the respondent and that this witness replied that in his opinion the manner of construction, under the circumstances named, did not constitute good engineering. The respondent's expert witnesses had testified in great detail as to the existing conditions as they had seen them on the ground and as to the surrounding circumstances. One of the witnesses explained his answer by stating what, in his opinion, could have been done to meet the situation shown to exist. As pointed out in *Giraudi* v. *Electric Imp. Co., supra,* 'The cases do undoubtedly hold that an expert cannot be asked whether a structure is a safe one or whether certain methods are prudent, but all hold that facts may be elicited from the witness from which the conclusion inevitably follows.' In

that case, the court further said: 'The difference is largely one as to the form of the question, and, while I do not mean to say that it is immaterial, or that such an error may never be cause for reversal, I do not think it should be so held here. The answer of the witness gave the facts in full, and explained what methods would have been safe. All this information might have been obtained by proper questions. And then it was not very material here. The negligence of defendant was fully proven by other evidence.' In the instant case, no such technical question was involved as whether or not the aqueduct, in itself, was safe. If it be conceded that no layman is capable of passing upon the form of construction of such an aqueduct in order to give it the requisite strength to meet the strain to be placed upon it under the conditions under which it is to be operated, it does not follow that the other question as to the surroundings in which it was built and maintained and as to the danger that might lie in the great mass of light material immediately above it and under the canyon, is a question for experts alone. In our opinion the question presented was not one for experts alone, and there was ample evidence, aside from the expert testimony, to sustain the court's findings. We take it that the expert evidence upon this subject was admitted not as the only evidence which was material in that connection and not as passing upon the ultimate fact to be decided, but for the purpose of giving the court the assistance of the opinion of these experts, not as to whether the aqueduct was safe in itself but as to whether recognized principles of engineering had been followed with respect to where it was placed and with respect to what other measures had been taken to safeguard its operation. This was recognized by one of the witnesses for the respondent who referred to good engineering in his answer and, as a practical matter, we think it is recognized by the appellants, who also asked their witnesses whether the manner of construction under the circumstances was safe and prudent, although they added thereto the phrase 'and in accordance with good engineering practice'. This added reference to good engineering practice technically improved their question, but it may well be doubted whether it made any practical difference in the evidence thus brought out. It affirmatively appears that the trial court took all of the evidence, expert and

otherwise, into account in arriving at its decision and, we think, properly so. After a careful examination of the record, we are of the opinion that the defect in the form of these hypothetical questions was not fatal to the respondent's case and that the error, if any, in permitting these questions to be answered was neither prejudicial nor reversible. (*Mulholland* v. *Western Gas Constr. Co.*, 21 Cal. App. 44 [131 Pac. 110]; *Lemley* v. *Doak Gas Engine Co.*, 40 Cal. App. 146 [180 Pac. 671]; *Bowen* v. *Sierra Lbr. Co.*, 3 Cal. App. 312 [84 Pac. 1010].)

■ ''The court's findings with reference to negligence in connection with the manner in which the aqueduct was operated on the night on which the break occurred also finds some support in the evidence. While there is some testimony that the appellants doubled their force of men that night by sending extra men to certain points at which men were regularly stationed and kept, the only evidence in the record is to the effect that the aqueduct was not patrolled and there is no evidence of anything material being done by these extra men except in one case where aid was given in repairing a floodgate which would not open. While this gate was repaired it was not opened until long after the damage was done. Although the rain had been particularly heavy during the preceding three days and was particularly heavy on the night in question, the aqueduct was kept running nearly full and there is evidence that nothing was done to discover what amount of debris had been washed into the aqueduct. There is some evidence that the break here in question occurred about 8:30 o'clock on the night of the 26th. The aqueduct was completely filled just below the break, the entire stream of water carried by the aqueduct was diverted down the hill across the respondent's property, and the break was not discovered until some time early the next morning, although one of the appellants' men was stationed at a point two and one-half miles below the break and he testified that in the performance of his duty he made an examination of the aqueduct to see how much water it was carrying every hour during the night. The matter of negligence in connection with the operation of the aqueduct on the night in question is of minor importance as compared with the question of negligence in its construction and maintenance in general,

but there is sufficient evidence in the record to support the findings as to each phase of negligence charged.

"We will next consider the matter of damages. The court found that at the time of the break in the aqueduct there were on the lease owned and controlled by the respondent approximately 200 acres which were covered with deposits of trona varying in depth from twelve inches to four feet; that 130 acres of this was covered with highgrade trona; that the water flowing through the break in the aqueduct over and across the respondent's premises and the sand, soil, silt and debris deposited thereon by said flow of water destroyed and rendered worthless 75 acres of high-grade and 80 acres of low-grade trona deposits; that said flooding washed away and destroyed approximately 90,000 tons of the highest· grade of trona; that in addition to the destruction of such trona deposits the fresh water thus flowing and the soil, silt and gravel carried therewith reduced the purity and strength of the brine which had existed on respondent's leasehold so that it became necessary for the respondent to add large quantities of trona to such brine to bring the same up to a required gravity; that about two miles of a roadway which had been five and one-half miles long was washed out, rendering the whole roadway useless and valueless; that several hundred feet of pipeline and certain power lines were washed out; and that respondent was compelled to make certain repairs to its pipelines, power lines and pumping plants, to build a longer road to its remaining trona deposit, to construct an extension to its pipelines and to put in a new pumping plant. The court then found that by reason of the negligence of the appellants the respondent had been damaged in the sum of $236,251.96.

"The appellants attack this last finding, as to the amount of the damages, as being without support in the evidence. The only support for the amount of the damages as found by the trial court is to be found in the testimony of one of the respondent's officers. This witness testified that the respondent's books disclosed that $710.64 was spent in repairing pipelines; that the entire road, a part of which was washed out by the flood, had cost $6,767.50 when originally constructed about two years prior to November, 1926; that after the flood $9,912.80 was spent in building a new road to the remaining trona deposit, in building a new pipeline for the brine supply,

and in building a new pumping plant at the end of this pipeline; that while the repairs were being made it cost the respondent $36,161.02 in increased operating expenses; and that for about three months prior to the break in the aqueduct the respondent had been making a profit of $2.53 per ton on all trona sold. Applying this profit to the 90,000 tons of trona said to be destroyed this witness stated that the damage to the trona was $227,700. The court reduced this last figure by $45,000, deducting the royalty of 50 cents per ton which the respondent would have had to pay to the state in the event the 90,000 tons of trona destroyed had been removed by the respondent. Otherwise the court adopted the figures given by this witness, resulting in the judgment of $236,251.96.

▉ "The largest item of damage was the injury done to the trona deposits on this land and the most important legal question presented on this phase of the case is as to the measure of damage properly to be applied in that connection. The appellants maintain that any injury done by them to the trona deposit was an injury to real estate and that the usual rule for measuring such damage applies, that is, the difference between the value of the land before and after the injury. On the other hand, the respondent contends that trona is a mineral, that a different rule applies where mineral land is injured or destroyed, and that the proper measure of damage here is the value of the destroyed trona less the cost of taking the same from the ground."

The parties have argued at some length the question as to which of these rules is appropriate to the determination of the damages suffered in the instant case. In our opinion, there is little to be gained from their consideration in an abstract form, or from a discussion of cases dealing with the ordinary situation of injuries to land. Plaintiff is admittedly entitled to an amount "which will compensate for all the detriment proximately caused". (Civ. Code, sec. 3333.) There is authority to support the view that the rule governing injury to timber may be applicable to injury to ores, and that in such case the value of the property destroyed may be the measure of damages. (See 4 Sutherland on Damages, 4th ed., sec. 1019.) But if that rule be not applicable, then the only other measure is the difference in value of plaintiff's leasehold before and after the damage, and it

seems obvious that this depends upon the value of the trona which is destroyed. Plaintiff's lease was given solely for the purpose of taking this particular mineral from a deposit which was unique in character. Opinion evidence as to the difference in value of the leasehold before and after the injury could not be based upon values of similar land because there is no similar deposit known. Hence the value of the mineral destroyed, less the cost of producing and marketing it, is a fair measure of the damage. The trial court was therefore not in error in applying this rule.

■ Defendant objects that even under the rule applied the evidence was insufficient to show the value of the trona in place. On this point it appears, however, that there is no way to determine the value of the trona in place. Evidence was offered that there was no market for "raw trona" in place. It would seem, therefore, that in taking the selling price of the finished product, deducting the cost of producing it and further deducting the royalty payable to the state, the court adopted the only possible method of arriving at the damage suffered.

■ Defendant attacks the allowance of $36,161.02 for increased operating expenses during the period following the flood, but the finding on this item of damage is supported by sufficient evidence. A further objection of defendant, that the court duplicated certain items amounting to the sum of $8,702.94, is conceded by plaintiff, and the judgment may be reduced by that sum.

■ We are accordingly satisfied with the general conclusion of the court below, together with the above concession by plaintiff; but in one important respect the judgment is erroneous and it must be reversed. We have approved the view of plaintiff, and permitted a recovery based upon its own past experience in cost of production and selling price, holding as we do that in spite of some speculative elements in this measure of damages it is the only one which can practically be applied to this unusual situation. But there is another item in the past experience of plaintiff, namely, its rate of production and sale. There is evidence that at such rate it would take thirty-six years to process and sell the 90,000 tons of trona destroyed. The court awarded as damages the total profits which would have been made, according to past ex-

perience, during that period, and it awarded those profits as a lump sum, payable now. Certainly the present computed value of those future profits is much less than the total which would be realized over the entire period. Herein lies the defect in plaintiff's position. It is true that the only way to make any reasonable determination of its losses is to consider the profits which would normally have been made from sale of the destroyed trona; in other words, there is no other fair way to determine the value of the trona in place, and thus the injury to plaintiff's leasehold. But plaintiff's profits from that particular trona would have been, at its present rate of production, yearly sums realized for thirty-six years, and such yearly sums represent the maximum damage proved. Plaintiff is, to be sure, entitled to have these sums computed and awarded at their present value, but, in view of normal rates of return on money, this amount must be considerably less than that awarded. It is necessary, therefore, that the case be reversed in order that the lower court may take competent evidence to establish the present value of those profits. In other respects we are in accord with the method of computing the damages which the trial court employed.

 A point strenuously urged by defendant upon the hearing is that the trial court committed reversible error in permitting certain cross-examination of defendant's witness Van Norman. This witness was employed in the construction of the aqueduct and was in charge of maintenance and operation. On direct examination he testified to his inspection in 1921 of the territory surrounding the canyon where the break subsequently occurred, and declared that it was his opinion at that time that no overhead or underground drainage was necessary. On cross-examination he was asked whether he had authorized the construction of a large number of spillways after the break, and defendant's objection to the question was overruled. Defendant points to the settled rule that changes made or precautions taken after an accident are not admissible to show negligence at the time of the accident. Counsel for plaintiff, however, made it clear that this questioning was not directed to the issue of negligence, but was for the purpose of weakening the testimony of defendant's expert witness by showing that he had subsequently changed his opinion as to the necessity of drainage. Whatever weight may be

given to such a showing, it is clear that for this purpose, the question was not improper, and the rule is of course well settled that if evidence is admissible for any purpose, it must be received, even though it may be highly improper for another purpose. In such case the danger of prejudice is a practical risk which is unavoidable, though in jury trials the other party is entitled to an instruction limiting the purpose for which the evidence may be considered. (See *Wagner* v. *Atchison etc. Ry. Co.*, 210 Cal. 526 [292 Pac. 645]; *Adkins* v. *Brett*, 184 Cal. 252 [193 Pac. 251].) It follows that in the instant case the court committed no error in permitting the question to be asked.

The findings and conclusions of the court below on all issues, including all items of damage found, are approved in all respects except as follows: (1) the amount shall be reduced in the sum of $8,702.94, in accordance with the concession of plaintiff; and (2) the damage to plaintiff's leasehold shall be computed by determining the present value of the sum found by the court below as the profit which would have been realized from the sale of the destroyed trona, in accordance with the views hereinbefore expressed.

The judgment is reversed for the sole purpose of determining this sum, and the trial court is directed to enter judgment for the plaintiff upon such determination, each party to pay its own costs on appeal.

Waste, C. J., Thompson, J., and Seawell, J., concurred.

SHENK, J., Concurring and Dissenting.—I concur in the opinion of the majority except in so far as it requires the trial court to compute, which I assume means to determine by calculation, the present value of the sum which the court found to be the damages for the destruction of the mineral, on some basis of "profits" to be realized from future production. I am unable to find authority or justification for any such rule in the law of damages for tort. When the trial court has applied, and this court has now approved, the correct rule for the measure of damages in such cases, namely, the difference between the market price of the mineral refined and ready for market on the one hand, and the expense of mining and preparing the raw material for market and the royalty

to the state on the other, regardless of whether the mineral is to be mined now or next year or not at all at the owner's option, the result reached by the trial court would necessarily follow. The value of the mineral in place at the time of its destruction was the issue. It was established by competent evidence and the question of future profits was not properly in the case. It seems to me that the rule now laid down has injected into such cases elements and problems unknown to the law.

Rehearing denied.