[Civ. No. 657.   Fifth Dist.   Jan. 27, 1967.]

BESSIE FAYE WESTBROOKS et al., Plaintiffs and Appellants, v. GORDON H. BALL, INC., Defendant and Respondent.

Chain & Younger, Morris B. Chain, Dustin N. Jameson and Edward L. Lascher for Plaintiffs and Appellants.

Spray, Gould & Bowers, L. Raymond Millard and Henry F. Walker for Defendant and Respondent.

CONLEY, P. J.—The widow and daughter of Andrew J. Westbrooks, as his sole heirs, sued the defendant for damages for his alleged wrongful death. The jury brought in a verdict

for the defendant. Plaintiffs' motion for a new trial was denied, and they appealed.

At the time of decedent's death, the defendant, Gordon H. Ball, Inc., a corporation, was the general contractor constructing the freeway on route 99 in Bakersfield; decedent was an ironworker employed by the Soule Steel Company, a subcontractor. On the morning of his death, Mr. Westbrooks had been working with his steel company crew on the Brundage Lane bridge, a portion of the freeway project, approximately half a mile south of the Palm Street bridge where the fatal injury occurred. The freeway was headed along a north and south route, and there were numerous bridges which crossed the excavated roadway in an easterly and westerly direction. At noon, the decedent was instructed by his foreman to go to the Palm Street bridge area and there to pick up some bolt cutters, which had been left toward the easterly end of the Palm Street bridge by the steel crew on the previous day. Mr. Westbrooks was also requested to take up a collection for a disabled fellow employee of the steel crew from the employees of the defendant at the Palm Street bridge.

After eating his lunch, Mr. Westbrooks left for the Palm Street bridge area at about 12:30; he evidently obtained the bolt cutters before he began to solicit donations, as the instrument was later found in his pickup truck, which had been parked by him near the bridge. He talked then with Donald Wilson, one of defendant's labor foremen, on top of the bank near the abutment on the west side of the Palm Street bridge. Mr. Wilson and others of that crew contributed; decedent thanked Wilson for the money, turned, and started to descend the slope on the north side of the bridge toward the bottom of the freeway excavation so that he could return to his pickup truck. As Mr. Wilson watched, decedent descended the steep slope, bracing himself as he went. When decedent had gotten half way down the slope, Wilson walked away and did not see the rest of the descent; however, when on top of the bridge, Wilson heard a DW-20 caterpillar tractor below him coming northerly on the westerly haul road at the freeway site; he realized that it was entering the northbound or westerly tunnel chute under the bridge beneath him; Wilson then looked north; he saw decedent in the roadway below and that the DW-20 had come out of the north exit of the chute and was just a few feet from decedent; before Wilson could do anything, the caterpillar tractor, pulling a carry-all and

traveling about 20 to 25 miles an hour, hit Westbrooks and crushed him, causing his death that same day.

Several photographs in evidence showed graphically the northern exit of the west opening under the Palm Street bridge through which northbound earth movers—the DW-20's —traveled, the embankment on the north side of the Palm Street bridge down which the decedent had descended prior to being struck, and the west haul road.

Having excavated the area where the Palm Street bridge was to be built, the defendant caused scaffolding or false work to be put in and continued necessary excavation of soil south of Palm Street; the dirt removed from the excavation was moved by DW-20's and carry-alls from the area where it was dug in a northerly direction under the Palm Street bridge to the vicinity of California Street north of Palm Street; openings were made for two haul roads underneath the bridge, one on the east side and one on the west side. Forms on top of the bridge were being constructed where the mix would be poured eventually to make a solid concrete roadway across the top of the bridge. The tunnel chute under the westerly end of the bridge was approximately 90 feet in length; along either side of both the east and west openings a concrete strip or abutment was constructed, 18 to 20 inches high, approximately two feet wide and 12 to 14 feet apart. Plywood panels were affixed to the scaffolding part way up the sides of each opening, extending approximately 11 feet upward from the concrete strips; the abutments extended beyond the ends of the plywood for approximately five feet; the plywood panels considerably interfered with a view from, or into, the chutes, but did not completely obscure visibility, which varied with the angle of observation.

The evidence left some doubt whether such plywood construction was used by construction men in similar situations, but Mr. Wilson testified that its employment was a normal procedure. Several reasons were advanced for the use of plywood; it was said that it was placed so that nothing could fall into the haul road from the sides; that it was installed as a safety measure for drivers to prevent disturbing flicker while moving through the tunnel, particularly during night utilization, and, also, to prevent children, after school and in the evening hours, from playfully throwing clods or wooden blocks at drivers, so that it furnished some protection to both children and workmen.

The DW-20's consisted of a carry-all with front tractor, a combined unit weighing from 50 to 55 tons when loaded with

dirt; the vehicle combination was about ten feet, six inches wide, with the radiator cap six feet, six inches above ground level.

At the time of the accident, earth was being moved from a point about 400 feet south of Palm Street to about two blocks north of the bridge at California Street, or to the Santa Fe Railroad tracks about one-half mile north. Loaded DW-20's would go north on the west haul road, unload in the north, and return through the east opening under the bridge to obtain another load. If a person were standing on the Palm Street bridge to observe the earth-moving operation, he could see both the loading and unloading of the DW-20's. It took each combination of vehicles about ten minutes to make a complete round trip, which would equate to approximately six trips per hour. On the day of the accident, three DW-20's were working during the daylight hours. Since each made its round trip in ten minutes, there was a DW-20 passing northbound, loaded, in the west chute under the Palm Street bridge approximately every 3⅓ minutes.

The record shows, according to the defendant, that all of the workmen in the area had been emphatically warned and instructed to watch out for the traffic on the haul roads.

Other workmen than decedent had previously gone at various times from the top of the west end of the Palm Street bridge down the steep slope from which decedent entered the freeway excavation. The slope at the point was angled at approximately 45 degrees. Earth-moving heavy equipment is a common tool in such work as was being done on the freeway. And decedent, as an ironworker, had been employed in similar construction since 1945, and was familiar with the operations generally necessary in building roads; he had often been around earth movers.

A DW-20 is very noisy in operation, and the sound would be increased when going through a chute under a bridge. DW-20's make a loud hissing noise, in addition to the rumble of tires; the machines have a turbo charger that turns 45,000 revolutions per minute, and one witness said that when operating it would be noisy as a locomotive passing 10 feet away. Workers in this industry are often partly deaf because of the constantly continuing loud noises made by tractors in their near presence. However, Mrs. Westbrooks testified that decedent's hearing was normal and that "he always could hear good."

The tire marks left by DW-20's on the haul road, as shown in the photographic exhibits, were distinctive and they were

necessarily known to be such by experienced construction workers. The record also shows that the crew of steelworkers, including decedent, had been employed on the Palm Street bridge itself on the day before the fatal accident.

On the day of the accident, the defendant had run his pickup north from the Brundage bridge area along the westerly haul road and he parked his vehicle somewhat north of the west chute opening. During the time that decedent was talking with the workers at the top of the Palm Street bridge, several DW-20's had gone through the westerly chute.

Let us examine in more detail the evidence of what happened just before the fatal accident. Mr. Wilson watched decedent until the latter was 10 or 12 feet from the road. Although at the coroner's inquest and at the Industrial Accident Commission hearing, Mr. Wilson had testified that decedent was running down the embankment, he stated at the trial that what he meant was that the decedent was "in a fast move." Decedent was digging in his heels, bracing himself, as he proceeded down the embankment. He had himself under complete control and could have brought himself to a stop if he wanted to; he descended just as Wilson had done when he himself had gone down the slope. In fact, when decedent last was observed by Wilson on the embankment, he was slowing himself at a rate which would have brought him to a walk when he reached the road. If one were on the embankment or slope and about two feet west of the concrete abutment, he could look down around and see all the way through the bridge opening. And the further north of the bridge one was, the more he could see into the opening from the slope.

When decedent reached a point 10 to 12 feet from the road and was slowing himself down, Mr. Wilson walked out on the bridge. He heard the loud noisy approach of a DW-20 and he looked and saw it just as it was entering the bridge opening. He not only heard the noise but felt the vibration caused as the earth mover went through the chute. He then looked to see where decedent was. Decedent was in the road, upright, about three feet in front of the DW-20.

Mr. Slater was operating the DW-20 which struck decedent. He was seated in the driver's seat to the left center of the caterpillar and about eight or nine feet back from the crossbar located at the front of the tractor. Decedent was about a foot or two in front of the 6-foot 6-inch high radiator cap with his head and right arm showing about one foot above it when first seen by Slater. The collision occurred before Slater could

react. It was stipulated that Slater tried to stop the earth mover as quickly as he could after the impact.

The outcome of this case depended almost entirely upon the facts surrounding the accident, which resulted in the death of Mr. Westbrooks. The plaintiffs pled negligence on the part of the defendant, and the defendant in turn denied negligence, and, also, claimed that there was contributory negligence on the part of the decedent. The jury found for the defendant, and, unquestionably, a fair consideration of the record compels the conclusion that there is substantial evidence to support the verdict and the judgment. We have given thorough and painstaking attention to all of the conflicting claims. We do not find, however, that there is any prejudicial error which would require a reversal of the judgment.

The first argument advanced by the appellants is that the court erred in refusing to permit cross-examination of the defendant's general superintendent, Mike Zafretti, with respect to changes in the efforts of the defendant to protect people from being struck by DW-20's on the haul road after Mr. Westbrooks received his fatal injuries. Unquestionably, Mr. Zafretti had the power, as general superintendent, to order additional safety measures with respect to the westerly chute under the Palm Street bridge; he was the defendant's representative in charge of all operations. He testified that he thought the bridge, including the chute through which the DW-20 was driven, was properly constructed, that he did not specifically go to the structure to observe it after the accident or order any additional safety measures. The record, although not as clear as it might be, indicates that someone below him in the hierarchy of the construction company had ordered a chicken wire fence to be installed, running from the northern portal of the westerly chute and extending for a number of feet northerly, so that anyone intending to cross the haul road in an easterly direction would have to go a considerable distance northerly from the chute before attempting the crossing. The evidence indicates that Mr. Zafretti did not order any such change or even know about it.

██ The trial court was correct in not permitting the specific disclosure of this additional remedy through a cross-examination of Mr. Zafretti. The case relied upon by the contending parties as showing the law with respect to situations of this kind is *Pierce* v. *J. C. Penney Co.*, 167 Cal.App.2d 3 [334 P.2d 117]. That case laid down the well-known rule that it is generally improper, after an accident, to show additional

safety measures installed by a defendant in an attempt to obviate future injuries to persons in somewhat the same position as a plaintiff who has been damaged by the alleged negligence of such a defendant. The rationale of such a rule is sometimes justified by the contention that the proof of such additional safety measures, after the event, is basically irrelevant in that it tends to show either due care under new circumstances or extraordinary care in view of the event, and that it is not a fair standard of what a reasonably prudent person would have done in the way of precautions prior to the accident itself. But even more strongly, it is public policy that, if it were legitimate to prove every new safety measure installed after the occurrence of alleged negligence, the public generally would be discouraged from adopting any new measure for the safety of the public. If to install an additional means of preventing new accidents were to be considered an admission of negligence with respect to the old accident, it is likely that there would be a widespread refusal to do anything of the kind after a suit was instituted against a defendant for alleged former negligence. This would be clearly against public policy as any attempt to safeguard people is to be encouraged, rather than discouraged. Therefore, there can be no proof of the adoption of any new safety measure except under very restricted grounds, which will be noticed in a moment. To permit a cross-examination of Mr. Zafretti on the theory that as general superintendent he is bound by everything that any subordinate may order would be in effect to permit the introduction of additional safety measures in this fashion, and the general rule that such evidence cannot be received with respect to the negligence of a defendant, corporate or otherwise, would effectively disappear.

■ The exeption to the general rule above stated is this: If one in charge of installing safety measures were to testify that, in his opinion, the construction which was questioned was proper and it should develop that he himself ordered the performance of additional safety measures, it would be legitimate in cross-examination to ask him whether he had not adopted new measures at variance with his statement of previous safety. (*Pierce* v. *J. C. Penney Co., supra,* 167 Cal.App. 2d 3, 7; *Daggett* v. *Atchison, T. & S.F. Ry. Co.,* 48 Cal.2d 655, 661 [313 P.2d 557] ; *Hatfield* v. *Levy Brothers,* 18 Cal.2d 798, 809-810 [117 P.2d 841] ; *Inyo Chemical Co.* v. *City of Los Angeles,* 5 Cal.2d 525, 543-544 [55 P.2d 850].) ■ In the instant case, it was established that Mr. Zafretti did not order

the installation of the chicken wire, and, in fact, that he knew nothing about it. It would have been serious error to permit the cross-examination.

■ Next, the appellants complain that when they called one Jack Forrest, a DW-20 driver for the defendant, under section 2055 of the Code of Civil Procedure, they announced that they wished to qualify him as an expert in safety operations in connection with earth-moving equipment on major construction projects. The court did not find that Mr. Forrest was qualified to give his opinion as to the propriety of certain safety measures as contended by the appellants. It is clear, and appellants actually concede, that whether or not a witness deserves the status of an expert is primarily for the trial court to decide; the appellate court will not interfere with such a ruling unless there is an obvious abuse of discretion. (*Kennedy* v. *Reece*, 240 Cal.App.2d 769, 771 [49 Cal.Rptr. 915]; *Strauss* v. *Kunin*, 156 Cal.App.2d 558, 565 [319 P.2d 783]; *Darling* v. *Pacific Electric Ry. Co.*, 197 Cal. 702, 714-715 [242 P. 703]; *Valdez* v. *Percy*, 35 Cal.App.2d 485, 492 [96 P.2d 142]; 19 Cal.Jur.2d, Evidence, § 296, p. 23.) ■ We find no abuse of discretion in the instant case with respect to the witness. Furthermore, the record is not clear as to exactly what opinion the plaintiffs desired to solicit from Mr. Forrest. In this connection, it is certain that a witness, whether technically an expert or not, cannot invade the province of the jury in determining the question of negligence or contributory negligence. An examination of the record indicates that all factual matters which would have formed the basis of the conclusion of a so-called expert as to whether negligence existed on the part of the defendant or the decedent were actually introduced in evidence, and the conclusion as to whether or not there was negligence or contributory negligence was properly passed upon by the jury itself.

■ The third argument for a reversal centers about the inquiry of one of the jurors, Florence Porter, who asked the court whether there would be evidence that any safety order of the state had been broken. After the noon recess on one of the trial days, the court in chambers read into the record the note it had received during the noon hour from juror Porter to the effect that she had to hear a state or official safety engineer say a railing ''was not required,'' before she could evaluate the case; the court then told the jury that there was no state regulation which required a railing, and that if a state employee or official engineer were called that would be

his testimony. If the appellants were dissatisfied with the extent of the court's instruction, it was their duty at that point to ask for an additional charge, but they did not do so.

Respondent points out that defense counsel objected to the statement, and moved for a mistrial, which was denied, and that counsel for appellants opposed the mistrial motion and, then, did not object or claim that error had been committed by the court's statements to the jury, nor did they ask that the court add anything in its advice to the jury. If error occurred, appellants should have tried to correct it in the court below, but they did nothing and cannot now complain for the first time on appeal.

■ The fourth argument made by plaintiffs' counsel is that there were so many unwarranted objections by the other side during the trial and interruptions through proceedings carried on in chambers that the plaintiffs were deprived of a fair trial. While we do not approve of the frequency with which some courts seem to think it necessary to adjourn to chambers for the argument of objections to evidence and the discussion of other matters, or the apparent belief of some trial judges that juries are very fragile instruments and easily prejudiced one way or the other by arguments on the admissibility of evidence, we cannot accede to the apparent viewpoint of appellants that the trial judge is not the sole person during a trial to determine whether a matter which one side or the other desires to bring up should be heard outside of the presence of the jury.

■ Appellants also contend that because the final argument for plaintiffs was interrupted about ten times by *unsustained objections,* the jury was distracted, and that the objections were framed so as to imply that counsel for plaintiffs were guilty of reprehensible conduct.

But a party must, in good faith, make timely objections during a trial in order later to take advantage of errors on appeal; counsel must object to ''improper procedure'' or ''improper questions'' or ''inadmissible evidence'' or ''improper argument.'' Otherwise, a later claim of error is deemed to have been waived. (*Wagner* v. *Osborn,* 225 Cal. App.2d 36, 43-44 [37 Cal.Rptr. 27]; *Horn* v. *Atchison, T. & S.F. Ry. Co.,* 61 Cal.2d 602, 610-611 [39 Cal.Rptr. 721, 394 P.2d 561].) And we, therefore, cannot accede to appellants' argument in this respect.

■ Finally, appellants argue that the evidence of contributory negligence was not sufficient to overcome the pre-

sumption of due care on the part of the decedent as it existed prior to the adoption of the present Evidence Code (former Code Civ. Proc. § 1963, subd. 4; *Smellie* v. *Southern Pacific Co.,* 212 Cal. 540 [299 P. 529]). The respondent interprets this argument to be an objection to instructions on contributory negligence, and states that the appellants requested certain instructions on contributory negligence and cannot now complain, that specific evidence, including legitimate inferences, sustain the submission of that defense to the jury; it also points out that since the record does not show who requested any of the instructions on contributory negligence, the presumption is that appellants requested them all. (*Lynch* v. *Birdwell,* 44 Cal.2d 839, 846 [285 P.2d 919].)

In their reply brief, appellants assert that they are not complaining of the giving of charges on contributory negligence, but, instead, that in their view the evidence of contributory negligence was insufficient to overcome the statutory presumption of due care on the part of the decedent. The appellants concede that the presumption is disputable, but they say that it cannot be overcome automatically just because there was evidence to the contrary, and that it was a form of evidence and may outweigh positive evidence offered against it. The appellants argue that no one saw decedent as he went off the bank after descending the latter half of the slope, and, consequently, that there was no eyewitness testimony of his conduct at that time to dispel the presumption of due care, or upon which the jury could have based a finding of contributory negligence.

However, the record showed that decedent was an ironworker of many years experience, employed for a long period of time in and around road construction projects where earthmoving equipment was used; that on the day before the accident, he had been working on the Palm Street bridge overcrossing itself while DW-20's were operating under the bridge on the haul roads; that these noisy earth movers had been loading south of Palm, traveling north on the west haul road under the Palm Street bridge opening, unloading near California Street to the north and returning by way of the east haul road under the east Palm Street bridge opening to the place of reloading; that this took 10 minutes for each DW-20 operating on the haul roads in this particular vicinity; that on the day of the accident, because decedent twice crossed a haul road where the DW-20's were passing to get the bolt cutters, and then crossed the west haul road to collect

donations, he should have noted that heavy equipment customarily passed through the west bridge chute; that decedent held himself under control going down the embankment, and that his footprints showed that he came out on the haul road about 15 feet away from the north end of the west bridge chute; that he could have stopped himself while on the slope, and that the nearer he approached the bottom, his view of the bridge opening improved, so that he could have seen completely through the chute at the bottom of the slope; that the decedent had good hearing, and, although the noise of the approaching equipment was tremendous, he carelessly went out into the haul road in total disregard of the approaching DW-20. Nothing was done by defendant, or its employees, which prevented the decedent from looking out for his own safety during his progression down the slope and toward his pickup; consequently, the question of contributory negligence was a question of fact for the jury.

The judgment is affirmed.

Stone, J., and Gargano, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied March 22, 1967.