Filed 2/4/25  Soto v. Walmart CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| LAURA SOTO, et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>WALMART, INC.,<br><br>Defendant and Respondent. | F086202<br><br>(Super. Ct. No. VCU282959)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  David C. Mathias, Judge.

The Wagner Law Group, James M. Makasian and Nicholas J.P. Wagner; Law Office of Mark Schallert and Mark Schallert, for Plaintiffs and Appellants.

Sims, Lawrence & Broghammer, Bradley R. Larson and Michael Richardson, for Defendant and Respondent.

-ooOoo-

Gustavo Garcia stole several boxes of nine–millimeter ammunition from a Walmart store and went on a crime and murder spree that resulted in the deaths of two individuals, including Rolando Soto, Sr. (decedent).

Appellants/plaintiffs are decedent's spouse, Laura Soto, and the couples' three children, Rolando Soto, Jr., Yvette Soto, and Klarissa Soto (collectively, plaintiffs).[1] Plaintiffs sued Walmart, Inc. (Walmart) alleging it negligently stored the ammunition in violation of Penal Code section 30350 and related regulations. As a result, they contend Garcia was able to access the ammunition without the assistance of a Walmart associate and steal it. They contend Walmart's negligence allowed Garcia to obtain the means by which he murdered decedent, and that Walmart's negligence proximately caused decedent's death.

The case was tried before the trial court sitting without a jury. The court found in favor of Walmart on all causes of action and judgment was entered accordingly. Plaintiffs appeal.

While we understand the tragic circumstances of decedent's death and the profound loss to his family, the law and facts of this case do not support the relief requested by appellants/plaintiffs. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Garcia's Theft of Ammunition

On December 16, 2018, at approximately 12:26 p.m., Garcia entered a Walmart store located in Tulare County, California, and proceeded to the Sporting Goods Department where firearm ammunition was on display in three adjacent cases. The display cases were each made of metal framing and each were fronted by two glass doors on a track rail system. Walmart used a ratchet lock to keep the glass doors from opening. The ratchet lock was in the locked position on the date and time in question.[2]

---

[1] Decedent's spouse, Laura Soto brought suit against Walmart, Inc. in her individual capacity and as guardian ad litem for Rolando Soto, Jr. and Yvette Soto. Klarissa Soto joined the lawsuit in her individual capacity.

[2] The record on appeal includes a digital video of one of Walmart's ammunition display cases and a Walmart asset protection associate, Nyna Johnson, demonstrating how the locking mechanism is unlocked, and how the glass doors slide. The video was

2.

Jacob Gomez was at the Walmart with his brother Brian Riley Gomez (collectively, the Gomez brothers) when Garcia arrived at the ammunition display case. Both brothers testified that, although the glass doors of the case were locked, Garcia was able to manipulate and maneuver the glass doors of the left-most case enough to create a gap that allowed him to gain access to the ammunition. The witnesses were uncertain how Garcia accomplished this but both offered their impression that Garcia had been able to get one or both of the glass doors to come off of their track railings. Jacob Gomez testified Garcia would not have been able to get inside the display case unless he torqued or tweaked it in some manner.

Jacob Gomez was asked to view a photograph[3] and to state whether there was a "gap between the glass and the panel there, like depicted in that photo?" He responded: "I can't tell you if I remember that gap was there specifically…. [W]here the lock meets in the middle there is a gap that you can shove, you know, a pinky in if you wanted to." He was asked, "[d]id you observe there was actually a gap on the leftmost side of this cabinet that he somehow managed to put his fingers in it?" he responded, "I did not observe a gap big enough for him to put his fingers in on that specific day." He was

taken in December of 2018 or the following January. Ms. Johnson could not recall whether the display case depicted was the same case Garcia breached, but she indicated it was "essentially the same in terms of the design, configuration, the placement of the locks, all of those things."

Another digital video depicting Walmart's ammunition display cases was admitted into evidence. The video was taken in January 2019. The video was designated as part of the record on appeal but the storage device containing the exhibit and in possession of the trial court was corrupted and not viewable. Pursuant to this court's order issued on October 28, 2024, the trial court received a replacement video and stipulation from the parties stating the replacement video is "a true copy of the digital video that was played during trial," and authorizing its use in lieu of the corrupted digital video. In compliance with said order, the replacement video and stipulation were certified by the Tulare County Clerk and transmitted to this court as an augmented clerk's transcript.

[3] The photograph was not identified in the record.

asked by plaintiffs' counsel to demonstrate for the court "exactly how … Garcia took the ammunition out of the cabinet." The court instructed the witness, "just do it with your hands and I'll get the visual." Presumably, the witness complied but the visual representation was not described on the record.

Brian Riley Gomez testified Garcia attempted to tamper with the ratchet lock on the display case and, ultimately, "made the decision to just kind of push [the glass door] off the railing system and slide it over to be able to grab the boxes of ammunition." He testified there was "a small margin of — like, a gap in between where the glass meets the metal" that was approximately "an inch to two inches wide" on the left side.[4] When asked if there was a gap on the right side, he responded, "[f]rom what I remember, yes, I do believe so, but obviously I can't recall that event. It was so long ago." When asked if Garcia was able to make the gap bigger by pushing the glass, he responded, "Yeah, so basically like I said, he just kind of manipulated the glass to where he was able to move it to the right[.]"

Both Gomez brothers estimated that, after Garcia inspected and assessed the ammunition display case and its locking mechanism, it took him less than 30 seconds to gain access to the ammunition once he began maneuvering the glass doors and got them to move enough to retrieve the ammunition. As a result, Garcia was able to retrieve and steal two or three boxes of Winchester nine-millimeter rounds. The brothers reported the theft to Walmart associate George Souza, the employee in charge of the ammunition stock.

---

[4] Brian Riley Gomez testified he met with plaintiffs' counsel and reviewed a video depicting the Walmart aisle and display cases—presumably not taken on the day of the event—that depicted the left-most display case with a one to two inch gap between that glass panel and the side of the display. He testified the video was identical to the condition of the display case on the day of Garcia's theft.

None of the security cameras at Walmart captured Garcia breaching the ammunition display case but security cameras at the store entrance and exit show Garcia was in the store for approximately 11 minutes total, and left the store at approximately 12:37 p.m.

At or about 1:12 p.m., approximately 35 minutes after he left Walmart, Garcia shot an individual in a field in Exeter, California, some 20 miles from the Walmart store. Approximately eight minutes later, at about 1:20 p.m., Garcia performed an armed robbery at a convenience store approximately two miles from the Exeter field, and discharged his firearm in the process. Roughly two hours later, at about 3:20 p.m., Garcia shot and killed decedent who was standing in his yard. Winchester nine-millimeter bullet casings were found at the location of each shooting. After that, Garcia went on to kill another victim.

On December 17, 2018, the day after he stole ammunition from Walmart, Garcia was involved in a high speed car chase by law enforcement and crashed his vehicle. He got into a shootout with Tulare County sheriffs and eventually fled on foot leaving his car behind. At least two boxes containing an unspecified number of unspent Winchester nine-millimeter rounds were found in Garcia's car. Garcia then carjacked another vehicle and fled with sheriffs in pursuit. Garcia crashed this vehicle in a violent traffic accident and later died.

One witness, Annabelle Piedra, testified she had purchased a box of ammunition for Garcia at his request just one day prior to his theft of ammunition from Walmart. Piedra testified Garcia needed her to purchase the ammunition for him because he did not have a valid identification card. Notwithstanding, Walmart concedes the bullets Garcia used to murder decedent were bullets Garcia had stolen from the Tulare Walmart store.

## II. Select Additional Witness Testimony

### A. *Testimony of Walmart Personnel*

Jennifer Rodriguez, a Walmart asset protection (AP) associate whose duties involved conducting security for the store, testified it was Walmart's requirement and practice to have AP associates do a "security tour" of the entire store at the beginning of their shift. She was not on duty when Garcia breached the ammunition display case, but supervised and trained the AP associate who was on duty that day, Nyna Johnson. Ms. Rodriguez said an AP associate's routine begins with the associate checking emails to see if anything was reported requiring immediate attention. Then the AP associate does a "general controls tour" which includes, without limitation, looking for safety issues including checking the security at registers, checking the locks on all locked displays, and ensuring floors and stacked merchandise were clear of hazards. She testified that checking the ammunition display cases is a regular part of a security tour.

Jennifer Rodriguez testified she never saw anyone try to avoid the locking system on the ammunition display case as Garcia was described to have done, never saw evidence that anyone tampered with the display case prior to the date of the incident, and never encountered a situation where the display case was not locked.

Nyna Johnson, the AP associate on duty when Garcia broke into the ammunition display case, testified that she performed a tour of the store on the morning of the day in question and checked the ammunition cases as part of her regular routine, and that there was no problem with the locks on the cases that morning. Had she discovered a problem with the display case lock, she said she would have remained by the display case and would have called management to bring her a replacement lock and fixed the issue. She, too, was unaware of any prior incidents involving a breach of the ammunition display cases.

Tim Hart, Walmart's corporate merchandising director for shooting sports, described the process by which the ammunition display cases were designed and

6.

approved. He testified he had various suppliers make prototypes of the cases and bring them to Walmart's home office in Bentonville, Arkansas. He testified, "We would have a team of different people review those, make suggestions, engineers. We have ATF compliance review those. Our [AP] people are there, ops people, legal. So there's several people that are in these groups that review these fixtures." When asked whether he researches and takes into account the regulations of the various states on ammunition displays, he responded, "Yes. And then I have a team—I have a team that works with us from the ATF. We have an ATF compliance team that helps us with regulations and laws. And then we have an ops team that helps us as well when we make those decisions." Mr. Hart testified the fixtures are designed to deter theft but are not theft proof.

### B.      Testimony of Plaintiffs, Plaintiffs' Experts, and Law Enforcement

Decedent's spouse, Laura Soto, and the couple's three children each testified as to their relationship with decedent as a husband and father and as to their loss upon his tragic demise. Plaintiffs also offered testimony from several expert witnesses and two police sergeants who testified as to the details of Garcia's crime and murder spree, and largely tied the bullet casings retrieved from the various crime scenes to the ammunition Garcia stole.

The testimony of plaintiffs and the aforementioned witnesses is largely uncontradicted. As mentioned, Walmart has conceded that the ammunition used to murder decedent was the same ammunition Garcia stole from Walmart.

### C.      Competing Testimony of the Parties' Firearm/Ammunition Experts

#### 1.      Plaintiffs' Expert

Plaintiffs' expert, Jacob Paul Belemjian, the owner of a shooting range and a state and federally licensed firearm dealer and ammunition seller, testified that California law

provides "ammunition cannot be accessible to the public without the assistance of a sales associate"—a reference to the text of section 30350 of the Penal Code,[5] which reads:

> "An ammunition vendor shall not sell or otherwise transfer ownership of, offer for sale or otherwise offer to transfer ownership of, or display for sale or display for transfer of ownership of any ammunition in a manner that allows that ammunition to be accessible to a purchaser or transferee without the assistance of the vendor or an employee of the vendor." (§ 30350.)

Belemjian opined that Walmart's displayed ammunition stock was not in a "locked container" as required by section 4262 of title 11 of the California Code of Regulations (hereafter, "regulation 4262"), which provides:

> "Pursuant to Penal Code section 30350, ammunition shall not be displayed for sale or transfer in a manner that allows that ammunition to be accessible to a purchaser or transferee without the assistance of the vendor or an employee of the vendor. Ammunition displayed in a shopping area open to the public is not considered "accessible" provided it is in a locked container (e.g. display case, cabinet, cage)." (11 C.C.R. § 4262.)

Belemjian opined that regulation 4262 requires ammunition display cases be "fully enclosed" and that Walmart's ammunition display cases "obviously" were not fully enclosed because Garcia was able to gain access to the ammunition.

Belemjian testified that California law on the subject of storing ammunition in display cases is vague but that guidance is provided by other statutes. He testified that, "to some extent," business owners have to come to their own decision on how to comply with the law "based on reasonableness and the interpretation" of the law but that "it doesn't matter what anyone thinks is reasonable. It matters what the [Department of Justice] says and what [their] conclusions would be when they come and actually evaluate your facility."[6]

---

[5] All further statutory references are to the Penal Code unless otherwise stated.

[6] The record on appeal does not contain any evidence that the Department of Justice evaluated or made any determination with regard to whether Walmart's ammunition display cabinets complied with, or violated, the law or that Walmart was

8.

Belemjian testified he does not store his ammunition stock in display cases at his shooting range. Rather, he stores the ammunition he sells "behind the counter." He acknowledged his ammunition stock "is exposed, but there is an employee that is present, and that meets the requirements of the law."

### 2. *Defense Expert*

Defense expert, Emanuel Kapelsohn, testified he is a federally licensed firearm dealer and ammunition seller, and operates a consulting firm that conducts training for police, security personnel, military, and private individuals, in the United States and beyond. He holds a number of certifications from the Federal Bureau of Investigation, and the National Rifle Association, related to firearms and use of force training. He testified to having experience in "lock picking and defeating locks" and specialized knowledge of various types of security and safety glass.

Kapelsohn testified he performed a visual and hands-on assessment of Walmart's ammunition display cases. He said they are of a "general type that are used throughout the country, by Walmart for ammunition" but also by other retailers to secure high value merchandize "that they don't want the public to have direct access to without getting the help of a sales employee."

Kapelsohn further testified the ratchet lock Walmart used to keep the sliding doors of the ammunition display cabinet closed uses a "tubular key, which makes them very, very difficult to pick, much harder than a standard flat key lock." He, like Belemjian, testified a retailer need not put its ammunition on display in a locked container and, instead, can comply with California law by keeping the ammunition behind a sales counter, which is commonly done in California.

---

ever charged with a violation of section 30350 in connection with its display of ammunition stock.

Kapelsohn was of the opinion, based on both his own inspection of the ammunition display case and the testimonies of the Gomez brothers and Nyna Johnson, that the subject ammunition display case was "clearly a locked cabinet or locked container" as required by regulation 4262. He testified the law does not require that the ammunition display case be theft proof. He opined "there is no lock and no kind of container and no bank vault in the world that someone cannot break into. It just depends on skill and motivation and knowledge and all kinds of other things …. And it can't mean that it has to be hermetically sealed." He testified there is "always the capability of violating, of breaching that security. It's a deterrent to theft. It's not theft proof."

### III.    Procedural Background

On May 26, 2020, plaintiffs filed suit against Walmart. On July 14, 2020, plaintiffs filed their governing, first amended complaint alleging causes of action for general negligence, negligence per se, and intentional tort. In addition, plaintiffs named Walmart employee, George Souza, as a defendant in connection with the negligence causes of action.

On December 7, 2020, Walmart and Souza filed their answer to the first amended complaint. On October 8, 2021, the trial court granted summary adjudication in favor of Souza on all causes of action.[7]

On September 19, 2022, the case against Walmart proceeded to trial. On September 29, 2022, the parties presented their final witnesses.[8] On October 21, 2022, the parties filed simultaneous briefs to address relevant statutory interpretation issues

---

[7] Plaintiffs do not challenge the trial court's grant of summary adjudication in favor of Souza.

[8] The trial court kept the record open through the close of business on October 13, 2022, to give plaintiffs an opportunity to secure trial testimony from Souza. Presumably, plaintiffs were unsuccessful in getting Souza to testify at trial since the reporters' transcript does not contain his testimony.

pertaining to the storage and retail display of ammunition. On November 2, 2022, the parties delivered their closing arguments and the matter was taken under submission.

On December 12, 2022, the trial court issued its "(Tentative) [¶] Decision After Trial" (unnecessary capitalization omitted). On December 28, 2022, the trial court issued its "Decision After Trial" (unnecessary capitalization omitted). In it, the court stated that neither party requested a statement of decision. The court determined plaintiffs' first cause of action for general negligence is a " 'qualified civil liability action' and is barred by the [Protection of Lawful Commerce and Arms Act]." (15 U.S.C. §§ 7901–7903 [hereafter, PLCAA].) The court further determined that plaintiffs' second and third causes of action (for negligence per se and intentional tort, respectively) were premised on the contention Walmart had violated section 30350 in connection with its manner of displaying and securing firearm ammunition and that these causes of action were not barred by the PLCAA.

The trial court stated its ultimate findings, as follows: "…Walmart did not … offer for sale … or display … ammunition in a manner that allowed the ammunition to be accessible to a purchaser … without the assistance of the vendor. More specifically, … Walmart was in compliance with … [section] 30350 at the time Garcia stole the subject ammunition from the Tulare, [California] store. Absent the 'violation' element, there is no breach of a duty or presumption of negligence. As such, Plaintiff's second and third causes of action fail." As a result, the court found it unnecessary to "reach the remaining issues presented, to include the source of the ammunition, causation and comparative fault."

On February 16, 2023,[9] the trial court entered judgment in favor of Walmart and against plaintiffs, and incorporated the court's Decision After Trial into the judgment "as if fully set forth."

---

[9] Subsequent references to dates are to dates in 2023 unless otherwise stated.

On March 3, notice of entry of the judgment was filed and served.

On March 20, plaintiffs filed a notice of intention to move for a new trial. On March 30, plaintiffs filed their motion for a new trial. On May 1, the trial court denied plaintiffs' motion for a new trial.

On May 1, plaintiffs timely filed their notice of appeal.

## DISCUSSION

### I. Plaintiffs' Contentions on Appeal

Plaintiffs raise numerous contentions on appeal. They contend the trial court erred (1) by excluding evidence that Walmart made remedial changes to the design of its ammunition display cases following Garcia's theft of ammunition; (2) by failing to consider statutes that define the term "locked container," a term used in regulation 4262; (3) by failing to acknowledge and consider the voters' intent in approving section 30350 (Initiative Measure, Prop. 63, § 8.12, approved Nov. 8, 2016, eff. Nov. 9, 2016); (4) by failing to consider the statements of Walmart employees that the display case design was defective; (5) by not excluding or striking the testimony of defense expert Kapelsohn on grounds it was irrelevant and unsupported by substantial evidence; (6) by arriving at a decision that is not supported by substantial evidence; and (7) by arriving at a decision that endangers California citizens.

### II. Relevant Principles of Appellate Review

On appeal, "[w]e presume the trial court's judgment is correct, and to overcome that presumption appellants must affirmatively establish prejudicial error by providing an adequate record, citing to the record, and presenting a persuasive argument with citations to supportive legal authorities." (*LNSU #1, LLC v. Alta Del Mar Coastal Collection Community Association* (2023) 94 Cal.App.5th 1050, 1070.) "We will indulge all intendments and presumptions to support the judgment on matters as to which the record is silent." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 299, 267.)

12.

When no statement of decision is issued, or when a statement of decision is issued but the parties fail to object "to any ambiguities or omissions in it, the doctrine of implied findings applies. 'The doctrine of implied findings requires the appellate court to infer the trial court made all factual findings necessary to support the judgment. [Citation.] The doctrine is a natural and logical corollary to three fundamental principles of appellate review: (1) a judgment is presumed correct; (2) all intendments and presumptions are indulged in favor of correctness; and (3) the appellant bears the burden of providing an adequate record affirmatively proving error.' " (*County of Orange v. Barratt American, Inc.* (2007) 150 Cal.App.4th 420, 438–439; *Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 983.)

To the extent we are called upon to engage in statutory interpretation, such matters present questions of law subject to de novo review. (*General Atomics v. Superior Court* (2021) 64 Cal.App.5th 987, 993.) " 'As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose.' " [Citation.] 'We begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent.' [Citations.] The plain meaning controls if there is no ambiguity in the statutory language. [Citation.] If, however, 'the statutory language may reasonably be given more than one interpretation, " ' "courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute." ' " ' " (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265.) "Interpretation of an administrative regulation… is [also] a question of law which rests with the courts." (*American Hospital Supply Corp. v. State Bd. of Equalization* (1985) 169 Cal.App.3d 1088, 1092.)

We discuss additional standards of review below where necessary.

**III.** **Plaintiffs Do Not Challenge the Determination Their General Negligence Cause of Action Is Barred by the PLCAA**

Plaintiffs do not challenge the trial court's determination that their first cause of action for general negligence is barred by the PLCAA. We briefly discuss the PLCAA and the effect of the court's determination below.

Federal law provides, in relevant part: "A qualified civil liability action may not be brought in any Federal or State court." (15 U.S.C. § 7902, subd. (a).) As is relevant to the case before us, "[t]he term 'qualified civil liability action' means *a civil action … brought by any person against a … seller of a qualified product …  for damages, … or* other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party, but shall not include—[¶] … [¶] (ii) an action brought against a seller for … *negligence per se*; [¶] [or] (iii) an action in which a … seller of a qualified product *knowingly violated a State or Federal statute applicable to the sale or marketing of the product*, and the violation was a proximate cause of the harm for which relief is sought[.]" (15 U.S.C. § 7903, subds. (5)(A)(ii) & (iii), italics added.) Ammunition is a "qualified product" under the PLCAA. (*Id.*, at subd. (4).)

As stated by the trial court, "[a]bsent the 'violation' element, there is no breach of a duty or presumption of negligence." At trial, and on appeal, plaintiffs have premised their surviving causes of action on their contention Walmart violated section 30350.

**IV.** **The Trial Court's Exclusion of Evidence of Remedial Measures**

*A. Application of Evidence Code Section 1151 to Claims of Negligence Per Se*

Plaintiffs contend the trial court erred by excluding evidence Walmart made remedial changes to the design of its ammunition cases following Garcia's theft of ammunition. The court excluded the evidence under Evidence Code section 1151.

Plaintiffs contend Evidence Code section 1151 has no application to claims premised on a negligence per se theory. Neither party has cited any case law directly on point. Instead, plaintiffs argue negligence per se claims are similar to strict liability

14.

claims and that Evidence Code section 1151 does not apply to claims premised on a theory of strict liability—citing *Ault v. International Harvester Co.* (1974) 13 Cal.3d 113 (*Ault*).  We do not find plaintiffs' argument persuasive.

Evidence Code section 1151 reads, as follows:

> "When, after the occurrence of an event, remedial or precautionary measures are taken, which, if taken previously, would have tended to make the event less likely to occur, evidence of such subsequent measures is inadmissible to prove negligence or culpable conduct in connection with the event."  (Evid. Code, § 1151.)

The plain language of the statute is unambiguous that subsequent remedial measures cannot be used to prove negligence or culpable conduct.

Plaintiffs do not expressly contend Evidence Code section 1151 is ambiguous.  Instead, they seek to draw a distinction between claims based on a general negligence theory and those based on negligence per se.  Any distinction that may be drawn, however, is insufficient to render the term "negligence" ambiguous.  As discussed below, a claim based on a negligence per se theory still falls within the scope of a negligence cause of action.

"The negligence per se doctrine is codified in Evidence Code section 669, under which *negligence is presumed* if the plaintiff establishes four elements: (1) the defendant violated a statute, ordinance, or regulation of a public entity; (2) the violation proximately caused death or injury to person or property; (3) the death or injury resulted from an occurrence of the nature of which the statute, ordinance, or regulation was designed to prevent; and (4) the person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.  The first two elements are normally questions for the trier of fact, while the latter two elements are determined by the trial court as a matter of law."  (*Galvez v. Frields* (2001) 88 Cal.App.4th 1410, 1420 (*Galvez*), italics added.)

15.

"Negligence per se is an evidentiary doctrine, rather than an independent cause of action. [Citation.] It can be applied generally to establish a breach of due care under *any negligence-related cause of action*." (*Jones v. Awad* (2019) 39 Cal.App.5th 1200, 1210, italics added.) "Where the doctrine of negligence per se is applicable, the standard of conduct established by a relevant statute or ordinance is adopted as the duty of care *for purposes of a negligence cause of action*. [Citation.] In such cases, where the statute or ordinance is violated, the doctrine creates a rebuttable presumption of *negligence*. (*Epochal Enterprises, Inc. v. LF Encinitas Properties, LLC* (2024) 99 Cal.App.5th 44, 58 (*Epochal*), italics added.) "*Negligence per se is a way to establish ordinary negligence* by tying the standard of care to a specific 'statute, ordinance, or regulation of a public entity.' " (*Ibid*., italics added; *Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1285–1286.)

Thus, the only distinction between a negligence claim and a negligence claim that relies on the doctrine of negligence per se is the manner by which the claim is proved. Negligence per se is still ordinary negligence. (*Epochal*, *supra*, 99 Cal.App.5th at p. 58.)

Consequently, we conclude the plain language of Evidence Code section 1151 is unambiguous and its plain language encompasses claims based on a theory of negligence per se.[10] The trial court did not err.

---

[10] Moreover, we are of the opinion the policy underlying Evidence Code section 1151 is furthered by its application to claims of negligence per se. That policy is rooted in the belief that "the exclusion of such evidence may be necessary to avoid deterring individuals from making improvements or repairs after an accident has occurred." (*Ault, supra,* 13 Cal.3d at p. 119.) When applicable, the negligence per se doctrine only establishes a presumption of negligence. Once the presumption is established "the burden then shifts to the [other party] to rebut the presumption by proof that, among other things, '[t]he person violating the statute … did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law.' " (*Spriesterbach v. Holland* (2013) 215 Cal.App.4th 255, 264, quoting Evid. Code, § 669, subd. (b)(1).) If courts were to admit evidence of remedial measures, such evidence would likely undermine any evidence a defendant might offer to rebut the charge. If that were the law, a defendant would be substantially

16.

### B. Impeachment Exception to Evidence Code Section 1151

Plaintiffs contend Walmart's modification of the ammunition display cases after Garcia's ammunition theft was "admissible to impeach Walmart's defense that it complied with section 30350." "We review a trial court's ruling on the admissibility of evidence for abuse of discretion." (*Nevarrez v. San Marino Skilled Nursing & Wellness Centre, LLC* (2013) 221 Cal.App.4th 102, 117.) " 'A court abuses its discretion if its ruling is " 'so irrational or arbitrary that no reasonable person could agree with it.' " [Citation.] A court's discretion also is limited by the applicable principles of law.' " (*Id*., at p. 120.)

Plaintiffs argue case law has "approved the admission of post-accident improvements to impeach a defendant's testimony that there was nothing wrong with the property," citing *Hatfield v. Levy Bros.* (1941) 18 Cal.2d 798, 809–810 (*Hatfield*), *Inyo Chemical Co. v. City of Los Angeles* (1936) 5 Cal.2d 525, 543–544 (*Inyo Chemical*), and *Westbrooks v. Gordon H. Ball, Inc.* (1967) 248 Cal.App.2d 209, 216 (*Westbrooks*.) We

---

discouraged from making remedial repairs, which is precisely the effect Evidence Code section 1151 is designed to avoid.

Plaintiffs correctly note that *Ault* held Evidence Code section 1151 does not apply to strict liability cases. (*Ault*, *supra*, 13 Cal.3d at pp. 118–121.) The *Ault* court observed that Evidence Code section 1151 only excluded evidence of remedial measures when "offered to prove negligence or culpable conduct" and that "[i]n an action based upon strict liability against a manufacturer, negligence or culpability is not a necessary ingredient." (*Id*., at p. 118.) That is, a "plaintiff may recover if he establishes that the product was defective, and he need not show that the defendants breached a duty of due care." (*Ibid*.) *Ault*'s rationale for excluding strict liability claims from the ambit of Evidence Code section 1151 is inapplicable to the case at hand. As discussed, negligence claims (including those premised on a negligence per se theory) fall within the plain and unambiguous language of Evidence Code section 1151.

If the Legislature determines that negligence claims tried on a theory of negligence per se should not be subject to Evidence Code section 1151, it has the power to amend the statute. Until then, we are bound to adhere to the plain and unambiguous meaning of the statute.

17.

agree such evidence may, in appropriate circumstances, be used to impeach a witness. We disagree, however, that this case presents such circumstances.

In *Hatfield*, *supra,* 18 Cal.2d at page 810, evidence that a defendant ordered an employee not to wax the floor following a slip and fall accident was properly admitted to impeach that same defendant's testimony that there was nothing "unusual" or "wrong" with the waxed floor the plaintiff had previously slipped on. (*Id.,* at p. 810.)

In *Inyo Chemical*, *supra,* 5 Cal.2d at page 543, a witness who took part in the construction of an aqueduct that failed and caused damage to plaintiff's property testified he was of the opinion that no additional drainage areas needed to be established to prevent or ameliorate flooding and overflow of the aqueduct. (*Id.,* at p. 543.) Our high court concluded it was proper for the trial court to admit evidence that the same witness had authorized construction of additional spillways after the aqueduct failed because it "weaken[ed] the testimony" of the witness. (*Id.*, at pp. 543–544)

*Westbrooks, supra,* 248 Cal.App.2d 209, illustrates a limiting principle to the holdings in *Hatfield* and *Inyo Chemical*. In *Westbrook*, a steelworker involved in the construction of a freeway died when he was crushed by a tractor that came through a tunnel chute near where the steelworker was crossing. (*Westbrooks*, at pp. 211–212.) The steelworker's family sued the defendant general contractor. (*Id*., at pp. 210–211.) The defendant's general superintendent testified that he thought the chute was properly constructed and that he did not order any additional safety measures following the accident. (*Id.* at p. 215.) Plaintiffs' counsel wanted to cross-examine the general superintendent with evidence that a subordinate had, in fact, ordered subsequent safety measures but the trial court ruled the evidence inadmissible. (*Ibid*.)

In upholding the trial court's decision, the *Westbrooks* court wrote: "To permit a cross-examination of [the general superintendent] on the theory that … he is bound by everything that any subordinate may order would be in effect to permit the introduction of additional safety measures in this fashion, and the general rule that such evidence

18.

cannot be received with respect to the negligence of a defendant, corporate or otherwise, would effectively disappear." (*Westbrooks, supra,* 248 Cal.App.2d at p. 216.) "The exception to the general rule … is this: If one in charge of installing safety measures were to testify that, in his opinion, the construction which was questioned was proper and it should develop that *he himself* ordered the performance of additional safety measures, it would be legitimate in cross-examination to ask him whether he had not adopted new measures at variance with his statement of previous safety." (*Id.*, at p. 216, italics added.)

Here, plaintiffs contend that evidence of subsequent modifications to the ammunition display case would impeach the testimony of Melanie Rodriguez, the manager of the Tulare Walmart store during the time at issue. However, the testimony plaintiffs cite to was objected to on grounds of hearsay and sustained by the trial court. Plaintiffs were not entitled to introduce evidence to impeach testimony that was never admitted into evidence.[11]

Plaintiffs then argue "The evidence supports [plaintiffs'] claim that the shelving with glass panels was deficient on the day of the theft because it lacked the small brace [that Walmart installed as a remedial measure]. The fix did not require any repair to 'broken' glass or any other part of the case. In other words, the ammunition was not stored properly and everything was not 'perfect.' " Following this contention, plaintiffs offer a single citation to the testimony of AP associate Nyna Johnson which reads: "[Question.] In other words, what I guess I'm asking, do you know if the cabinet was fixed so that it could be—you know, so that—so that it could be displayed in the same

---

[11] Plaintiffs also offer a page and line citation following the above referenced deposition testimony of Melanie Rodriguez. The citation bears no relationship to Melanie Rodriguez's deposition testimony, and plaintiffs fail to quote, describe or otherwise discuss the content of the referenced citation. "We are not required to examine undeveloped claims or to supply arguments for the litigants." (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.) Consequently, any argument related to the bald citation has been forfeited.

way the next day? [Answer.] When I did my tour that morning everything looked perfect. I checked it off. I—you know, checked the lock, did everything as I did normally and it was fine." Notably, she immediately thereafter testified she had no knowledge of whether any remedial work had been performed on the ammunition display cabinet. Plaintiffs offer no evidence to demonstrate Ms. Johnson's testimony was untruthful in any respect.

Plaintiffs have failed to demonstrate how evidence of remedial repairs impeaches any witness testimony. No abuse of discretion has been shown.

## V.      Section 30350 and Regulation 4262

Plaintiffs contend Walmart's ammunition display cases did not meet the requirements of section 30350 and regulation 4262. For the reader's convenience, we again set forth the text of section 30350 and regulation 4262. Section 30350 provides:

> "An ammunition vendor shall not sell or otherwise transfer ownership of, offer for sale or otherwise offer to transfer ownership of, or display for sale or display for transfer of ownership of any ammunition in a manner that allows that ammunition to be accessible to a purchaser or transferee without the assistance of the vendor or an employee of the vendor." (§ 30350.)

Regulation 4262 provides:

> "Pursuant to … section 30350, ammunition shall not be displayed for sale or transfer in a manner that allows that ammunition to be accessible to a purchaser or transferee without the assistance of the vendor or an employee of the vendor. Ammunition displayed in a shopping area open to the public is not considered 'accessible' provided it is in a locked container (e.g. display case, cabinet, cage)." (11 C.C.R. 4262.)

Plaintiffs contend that the term "locked container," as used in regulation 4262, has a specific meaning as defined in other statutes, that the trial court failed to consider those statutory definitions, and that Walmart's ammunition display case does not fall within those definitions. Plaintiffs rely largely on section 16850,[12] which provides:

---

[12] In addition to section 16850, plaintiffs cite to section 626.9, which merely provides: " 'Locked container' has the same meaning as Section 16850[]" (§ 626.9,

"As used in this part, 'locked container' means a secure container that is fully enclosed and locked by a padlock, keylock, combination lock, or similar locking device. The term 'locked container' does not include the utility or glove compartment of a motor vehicle." (§ 16850.)

The Law Revision Commission Comments to section 16850, as amended in 2014, state, "[s]ection 16850 is amended to expressly apply the definition of 'locked container' to the whole of Part 6[]" of the Penal Code (i.e., sections 16000 through 34400).[13] Although section 30350 is contained in Part 6 of the Penal Code, it does not use the phrase "locked container." That phrase, as is relevant here, is contained only in regulation 4262.

Plaintiffs contend Walmart's ammunition display case was not a "locked container" because it was not a "secure container" and was not "fully enclosed" as those latter two terms are used in section 16850. In support of their contention, plaintiffs offer a number of dictionary definitions for the terms "locked" and "secure" and argue the ammunition display case was neither because it permitted Garcia to manipulate the glass doors of the case within 30 seconds to create a sufficient gap between the doors and metal framing of the case and enable him to retrieve ammunition. Plaintiffs contend the display case needed to meet a higher degree of security against theft and prevent theft—or, at least, the manner of theft committed by Garcia.[14]

---

subd. (e)(3)) and Business and Professions Code section 1288.3, which provides a similar definition to section 16850, but which applies to the storage of "biological specimens."

[13] The trial court did consider section 16850, as indicated in its Decision After Trial, but determined the statute applied "to the storage of guns in a motor vehicle." We observe, however, that many of the statutes in Part 6 of the Penal Code that use the term "locked container" do not involve storage of guns in a motor vehicle or during transport. (See, e.g., § 25205 [providing no criminal exposure under section 25200 for a child's access to a firearm if it was stored in a locked container]; § 27883 [relating to the loan of a firearm]; § 25135 [firearm storage in a residence occupied by person prohibited from possessing a firearm].)

[14] Plaintiffs also seemingly contend the ratchet lock used by Walmart to keep the display case closed does not meet the definition of a "padlock, keylock, combination lock, or similar locking device" but offer no reasoned argument to support the contention.

### A. Plaintiffs' Proffered Definitions, and Alternative Definitions

Plaintiffs cite to the following dictionary definitions for the following terms: that "locked" means " 'to make secure or inaccessible by or as if by means of locks' " (citing "Merriam-Webster"); that "secure" means " 'free from risk of loss' " (citing "Merriam-Webster") or " 'dependable; firm; not liable to fail, yield, become displaced,' " (citing "Dictionary.com"); and that " 'A secure place is tightly locked or well protected, so that people cannot enter it or leave it' " (citing "Collins on-line dictionary"). Plaintiffs have not provided uniform resource locators for the above definitions. However, our own reference to these resources demonstrates plaintiffs have chosen the definitions they believe best suit their argument to the exclusion of other definitions that might apply.

For example, plaintiffs quote only a portion of a particular definition offered by Merriam-Webster's online dictionary for the term "lock" or "locked." That particular definition, in full, reads: "to fasten in or out or to make secure or inaccessible by or as if by means of locks." (Merriam-Webster Unabridged Dict. Online (2018) <https://www.merriam-webster.com/dictionary/lock> [as of Feb. 3, 2025], archived at <https://perma.cc/S5ZA-GZXY>, at verb (1), ¶ 2a.) Other definitions for "lock" or "locked" offered by Merriam-Webster's online dictionary include, without limitation: "1 a: to fasten the lock of [¶] b: to make fast with or as if with a lock [¶] … [¶] 2 b: to fix in a particular situation or method of operation [¶] 3 a: to make fast, motionless, or inflexible by the interlacing or interlocking of parts." (*Id.*, at verb (1), ¶¶ 1, 2b, 3a.) Notably, the term "fast," when used as an adjective, is defined by Merriam-Webster's online dictionary to include, without limitation, "firmly fixed," "tightly shut," "adhering firmly," "not easily freed: stuck," "stable" (Merriam-Webster Unabridged Dict. Online

---

We deem this latter contention waived as a result. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [" ' "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citation to authority, we treat the point as waived." ' "])

22.

(2018) <https://www.merriam-webster.com/dictionary/fast> [as of Feb. 3, 2025], archived at <https://perma.cc/7CGV-9YX9>, at adjective, ¶ 1) or, when used as an adverb, to include, without limitation, "in a firm or fixed manner."  (*Id*., at adverb, ¶ 1.) There are a number of potentially applicable definitions for the term "locked" that do not also use the term "secure."  The various definitions above demonstrate the term "locked" could mean to make secure or inaccessible through the use of locks, or it could mean simply to fasten with locks.

If we accept the definition of "locked container" as defined in section 16850—i.e., to require a "secure" container as plaintiffs urge us to do, we note that even the term "secure" is somewhat amorphous.  Collins online dictionary, relied on by plaintiffs, offers the following definition, among others, for the term "secure":  "If an object is secure, it is fixed firmly in position." (Collins Dict. Online (2023) <https://www.collinsdictionary.com/dictionary/english/secure> [as of Feb. 3, 2025], archived at <https://perma.cc/Y8SW-UTGG>, at adjective, ¶ 5.)  The Merriam-Webster's online dictionary offers the following definition, among others: "affording safety." (Merriam-Webster Unabridged Dict. Online (2018) <https://www.merriam-webster.com/dictionary/secure> [as of Feb. 3, 2025], archived at <https://perma.cc/D68A-3RJ4>, at adjective, ¶ 1b.)  And the Cambridge online dictionary offers the following definitions, among others, for "secure":  "positioned or fixed firmly and correctly and therefore not likely to move, fall, or break; [¶] likely to continue and not fail or be lost." (Cambridge Dict. Online (2023) <https://dictionary.cambridge.org/dictionary/english/secure> [as of Feb. 3, 2025], archived at <https://perma.cc/5JBL-6VTB>.)  Among the Dictionary.com definitions for the adjective "secure" are "not liable to fail, yield, become displaced, etc., as a support or a fastening … [¶] affording safety, as a place … [¶] safe from penetration or interception by unauthorized persons."  (Dictionary.com Online (2023)

<https://www.dictionary.com/browse/secure> [as of Feb. 3, 2025], archived at <https://perma.cc/S7GX-52AL>, at adjective, ¶¶ 1, 2, 3, 8.)

Undoubtedly, a certain amount of security and safety was afforded by the ammunition display case. Few things are completely secure or invulnerable to access.

Plaintiffs also contend the ammunition display case was not "fully enclosed" as used in section 16850. Plaintiffs do not clearly articulate the basis for this contention but we presume they are relying on Brian Riley Gomez's testimony that there was a one to two-inch gap between the glass door and metal frame of the ammunition display case.[15]

We conclude regulation 4262 does not prohibit *some* gaps or open space in the display case. We reach this conclusion because regulation 4262 expressly allows a locked "cage" to be used to display ammunition. (11 C.C.R. 4262.) Merriam-Webster's online dictionary contains the following relevant definitions for the term "cage" as "a box or enclosure having some *openwork* for confining or carrying animals (such as birds)" and "an enclosure resembling a cage in form or purpose." (Merriam-Webster Unabridged Dict. Online (2018) <https://www.merriam-webster.com/dictionary/cage> [as of Feb. 3, 2025], archived at <https://perma.cc/N9HS-78DA>, at noun, ¶¶ 1 and 4a, italics added.) Thus, to the extent plaintiffs contend Walmart's ammunition display case was not fully enclosed because small gaps may have been present between the glass door and metal framing, regulation 4262 appears to permit this—so long as the ammunition remained inaccessible to would-be purchasers of ammunition without employee assistance. Notably, the uncontradicted testimony of the Gomez brothers demonstrates Garcia could not access the ammunition through a gap. Rather, Garcia had to manipulate

---

**15** Jacob Gomez's testimony was somewhat inconsistent with his brother's testimony. Jacob Gomez testified he did not remember if there was a gap "between the glass and the panel"—but did say, "as you can imagine, where the lock meets in the middle [of the glass doors] there is a gap that you can shove, you know, a pinky in if you wanted to." He further testified, "I did not observe a gap big enough for him to put his fingers in on that specific day."

24.

the glass doors for up to 30 seconds in order to create a gap large enough to retrieve ammunition.

We are cognizant that plaintiffs' counsel argued before the trial court that an existing gap in the display case may have aided Garcia in manipulating the glass doors. However, it appears the trial court, sitting as trier of fact, determined Garcia's breach of the display case was not proximately caused by any such gap.[16]

Notwithstanding, the term "locked container" as used in section 30350 appears to be reasonably susceptible to an interpretation that requires greater security than that which was afforded by the Walmart ammunition display case as well as an interpretation that it did not require greater security. Consequently, we now turn to the legislative and statutory history of section 30350 and its predecessor statutes.

---

[16] The reporter's transcript reveals the following discourse between the trial judge and plaintiffs' counsel during plaintiffs' closing argument: "THE COURT: And I think the evidence showed that this gap was not sufficient for Mr. Garcia to put his hand through and freely access the ammunition. [¶] [PLAINTIFFS' COUNSEL]: He had to pull off the rails: [¶] THE COURT: So my question to you from a factual standpoint: Does it matter if there was a gap? Does it matter if that gap was an 8th of an inch? Centimeter? An inch? And I know I'm going back and forth. But an inch? Inch and a half? Two inches? It wasn't sufficient for him to freely access the ammunition…. [¶] If he had to take the glass off the rails and, call it, dismantle the cabinet, why isn't that within the statute? …." When plaintiffs' counsel suggested "If you got a gap, all you got to do is reach in and pull them off[,]" the judge stated "Let me challenge you on that. My understanding from the evidence is that they were pushed in, not pulled in." Plaintiffs' counsel offered the following explanation: "My view of what happened … is—and this is why the gap's important for two reasons. If you push it off, that's going to widen the gap; right? And so, with the gap being widened, the fact that you start out with the gap and then you're able to push it off the rails, or perhaps push it in, however that might be, the gap allows you with the additional space that's provided by doing the pushing off or on the rails to get access. So the gap is very relevant." The court went on to comment that it took 30 seconds for Garcia to manipulate the glass doors of the display case to create a sufficient gap for Garcia to access the ammunition.

### B.     History of Section 30350

#### 1.     *Predecessor Statutory Scheme Enacted in 2009*

The genesis of section 30350 is former section 12061, enacted in 2009 as part of the Anti-Gang Neighborhood Protection Act of 2009 (AGNPA).  (Stats. 2009, Ch. 628 (A.B. 962), § 2.)  Subdivision (a)(2) of former section 12061 was substantively identical to current section 30350.

Section 12061 also prohibited ammunition vendors from allowing employees who met specified characteristics from handling, selling or delivering ammunition as part of their job (former § 12061, subd. (a)(1)); prohibited the vendor from selling/transferring ammunition without obtaining identification and specified information from the purchaser/transferee (*id.*, at subd. (3)); required retention of such records for five years (*id.*, at subd. (4)); allowed law enforcement to inspect those records under certain circumstances (*id.*, at subd. (5)); prohibited the vendor from knowingly making false entries in those records (*id.*, at subd. (6)); and prohibited the vendor from refusing to permit the examination and use of the records by authorized law enforcement (*id.*, at subd. (7)).  Other statutes enacted as part of the AGNPA prohibited certain individuals from purchasing or owning ammunition (former § 12316), restricted carrying ammunition on school grounds (*ibid.*), and required that ammunition transfers occur only in a face-to-face transaction and only after proper identification of the purchaser/transferee (former § 12318).

A California Bill Analysis for AGNPA stated, in relevant part:  "This bill imposes specified requirements on handgun ammunition sellers, primarily that sellers collect buyers' personal data and keep a log of such sales[.]"  (Sen. Pub. Safety Com., Sen. Appropriation Com., 3d reading analysis of Assem. Bill No. 962 (2009–2010 reg. Sess.) Sept. 4, 2009.)

### 2. *2010 Reorganization of Statutes*

In 2010, the Legislature enacted Senate Bill 1080, which resulted in a comprehensive, non-substantive reorganization of deadly weapon statutes. (Stats. 2010, ch. 711 (S.B.1080), § 6.) That bill resulted in a repeal of former sections 12060, 12061, and 12316 through 12318, among many others. (Stats. 2010, ch. 711 (S.B. 1080).) It also resulted in the enactment of Article 3 of Part 6, Title 4, Division 10, Chapter 1 (hereafter, "Article 3"). (Stats. 2010, ch. 711 (S.B. 1080).) Subdivision (a)(2) of former section 12061, which was repealed by Senate Bill 1080, was continued in the original version of section 30350, which was enacted as part of Article 3. Each of these (now former) statutes were substantively identical to the current version of section 30350.

### 3. *The Safety for All Act (Proposition 63), Enactment of Current Section 30350*

In 2016, the Safety for All Act (hereafter, Proposition 63) was put before the voters of California and passed. (Initiative Measure, Prop. 63, approved Nov. 8, 2016.) Upon its passage, current section 30350 was added to the Penal Code.

In addition, Proposition 63 added the following statutes to the Penal Code: section 30342 (requiring "a valid ammunition vendor license" for sales of "more than 500 rounds of ammunition in any 30–day period"); section 30347 (requiring a certificate of eligibility for an ammunition vendor employee "who handles, sells, delivers, or has under his or her custody or control any ammunition); section 30348 (relating to ammunition sales at gun shows); section 30352 (specifying information an ammunition vendor must collect from certain purchasers/transferees of ammunition before consummating the transaction); and section 30363 (establishing reporting requirements in the event of lost or stolen ammunition).

In adopting Proposition 63, the people of the State of California made the following relevant findings and declarations: "Reasonable, common-sense gun laws reduce gun deaths and injuries, keep guns away from criminals and fight illegal gun

trafficking. Although California has led the nation in gun safety laws, those laws still have loopholes …. We can close these loopholes while still safeguarding the ability of law-abiding, responsible Californians to own guns for self-defense, hunting and recreation." (Initiative Measure, Prop. 63, § 2.5, approved Nov. 8, 2016.) "We know background checks work. Federal background checks have already prevented more than 2.4 million guns sales to convicted criminals and other illegal purchasers in America. In 2012 alone, background checks blocked 192,043 sales of firearms to illegal purchasers including 82,000 attempted purchases by felons. That means background checks stopped roughly 225 felons from buying firearms every day. Yet California law only requires background checks for people who purchase firearms, not for people who purchase ammunition. We should close that loophole." (*Id.*, at § 2.6.) "Right now, any violent felon or dangerously mentally ill person can walk into a sporting goods store or gun shop in California and buy ammunition, no questions asked. That should change. We should require background checks for ammunition sales just like gun sales, and stop both from getting into the hands of dangerous individuals." (*Id.*, at § 2.7.)

The purpose and intent of Proposition 63, as is relevant to the case before us, were stated, as follows: "To keep guns and ammunition out of the hands of convicted felons, the dangerously mentally ill, and other persons who are prohibited by law from possessing firearms and ammunition. [¶] …To ensure that those who buy ammunition in California—just like those who buy firearms—are subject to background checks." (Initiative Measure, Prop. 63, §§ 3.2, 3.3, approved Nov. 8, 2016.)

### C.  *Regulation 4262*

The Department of Justice (DOJ) adopted regulation 4262, which became effective January 2, 2018. In its proposed action, the DOJ wrote that Proposition 63 "is intended to increase public safety by various means, including regulating the sale of ammunition to prevent it from being acquired by convicted felons, the dangerously mentally ill, and other persons who are prohibited from possessing firearms and

28.

ammunition. The proposed regulations will enable California ammunition vendors to comply with statutorily mandated licensing requirements for the sale of ammunition beginning January 1, 2018[.]" (2017 CA Reg Text 462642 (NS), July 14, 2017.) The DOJ stated, "[t]he proposed regulations will … provide clarification regarding the term 'accessible' as referenced in Penal Code section 30350." (*Ibid*.)

### D. The Express Purpose and Intent of Section 30350

Section 30350 and its predecessor statutes (former sections 30350 and 12061) speak in terms of *transactions* involving ammunition—i.e., the *sale* or *transfer of ownership* of ammunition. The statute says nothing about theft of ammunition. The statute authorizes the display of ammunition so long as it is not "accessible to a *purchaser* or *transferee* without the assistance of the vendor or an employee of the vendor." There is no mention of protecting against theft or making the ammunition display theft proof—all of which are worthy goals but not expressly mentioned in the statute.

The legislative history of former section 12061 demonstrates the purpose of that statute was to require "that sellers collect *buyers'* personal data and keep a log of such sales[.]" (Sen. Pub. Safety Com., Sen. Appropriation Com., 3d reading analysis of Assem. Bill No. 962 (2009–2010 Reg. Sess.) Sept. 4, 2009, italics added.) The bill required "ammunition vendors to obtain a thumb print and other information from ammunition *purchasers* …." and prohibited "*supplying or delivering* … ammunition to prohibited persons" and persons the vendor/transferor knows or reasonably should know is prohibited from possessing ammunition. (*Ibid*., italics added.) (In our view, a vendor does not supply or deliver ammunition when a thief steals it.) Notably, the argument in support of the bill was that it would "assist law enforcement in solving crimes" because many homicides "remain unresolved in part because the ownership and purchase of … ammunition cannot be traced." (*Ibid*.) None of the arguments in support or opposition to former section 12061 discuss deterring or preventing theft of ammunition. (*Ibid*.)

29.

When current section 30350 was approved as part of Proposition 63, the people adopted findings and declarations that identified loopholes in our gun safety laws with regard to the purchase of ammunition, and acknowledged the efficacy of background checks. (Initiative Measure, Prop. 63, §§ 2.5, 2.6, approved Nov. 8, 2016.) The new law sought to ensure that purchasers of ammunition undergo background checks just as do purchasers of firearms. Deterring and preventing ammunition theft were not mentioned.

We conclude, therefore, that the purpose of section 30350 was not to prevent theft of ammunition. It was intended (1) to prohibit ammunition vendors such as Walmart from selling or transferring ownership of ammunition to purchasers/transferees without first performing a required background check to determine that the would-be purchaser/transferee was not disqualified from acquiring the ammunition—a situation not presented by the facts of this case, and (2) in support of the aforementioned goal, to prohibit such vendors from displaying their ammunition stock in a manner that allows .purchasers/transferees to access ammunition without the help of the vendor or its employee.

We further conclude section 30350 and regulation 4262 do not require a heightened level of security for ammunition display cases that is sufficient to prevent the theft of ammunition. The purposes of the statute and regulation are met where the display case is sufficiently secure to prevent would-be purchasers and transferees from accessing ammunition without employee assistance.

## VI. Plaintiffs' Contention That Substantial Evidence Does Not Support the Judgment

" 'When the trier of fact has expressly or implicitly concluded that the party with the burden of proof failed to carry that burden and that party appeals, it is somewhat misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment.... Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding

in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Meister v. Mensinger* (2014) 230 Cal.App.4th 381, 395.)

The trial court determined "Walmart did not … offer for sale … or display … ammunition in a manner that allowed the ammunition to be accessible to a purchaser … without the assistance of the vendor[]" and that Walmart was in compliance with section 30350. The evidence supports the court's determination. More importantly, plaintiffs have not demonstrated the evidence in this matter compels a finding in their favor as a matter of law. As a result, plaintiffs' substantial evidence challenge fails.

## VII. Plaintiffs' Remaining Contentions

### A. *Voter Intent*

Plaintiffs' contention the trial court did not consider the intent of the voters when they voted in favor of section 30350 is largely premised on their preferred construction of the term "locked container" and their contention that "a locked container has a function to prevent theft short of actually breaking or destroying the container holding the ammunition[.]" As discussed, the voters who approved section 30350 were concerned with establishing a system that enabled and facilitated an ammunition vendor's ability to run background checks on ammunition purchasers and transferees. The purpose of the statute was not to prevent theft of ammunition—although the requirement that the ammunition display case be locked undoubtedly had the added benefit of deterring its theft. In light of our determination of voter intent, plaintiffs cannot prevail on this issue.

### B. *Contended Admissions of Walmart Employees*

Plaintiffs' contention that the trial court failed to consider statements by Walmart employees that the design of the display case was defective is likewise unavailing. The statements at issue were from Tim Hart, Walmart's merchandising director, and AP

associate, Jennifer Rodriguez. Hart testified that the display case was designed "to be very difficult to get into without some kind of tool"; that the display case "was designed to deter theft"; and should be designed to deter theft by an individual who uses only his hands and gains access to the ammunition within 30 seconds. Jennifer Rodriguez's deposition testimony was read into the record. She was asked "Your understanding is an ammunition display case, you should not be able to take it off the railings so you can open it without a key, correct?" She answered, "Yes." The above statements were not admissions that the display case did not meet the requirements of section 30350. Rather, they were admissions that the display case did not adequately prevent Garcia from stealing ammunition, which we have determined was not the purpose of section 30350.

Contrary to plaintiffs' contention, the trial court did consider these statements which accounts for the court's statement that "the referenced statements by the witnesses as elicited by Plaintiffs' counsel appeared to be random personal comments *without consideration for the applicable law*." (Italics added.) In addition, although the court determined the statements were "generally inadmissible as a layperson's opinion," the court concluded that "[t]he portions of any statements made by these witnesses that could be considered admissible was outweighed by the remaining testimony."[17] In light of this, and our determination that prevention of ammunition theft was not a purpose of section 30350, plaintiffs have not established any prejudice resulting from the court's determination that the comments were improper layperson opinions.

---

[17] There is a lingering question as to whether the trial court's comments in this regard applied to the testimony of Jennifer Rodriguez—as opposed to the testimony of Melanie Rodriguez, the manager of the Walmart store during the relevant time frame. In making its comments in its Decision After Trial, the court referenced the testimony of "Melody" [*sic*] Rodriguez. We have presumed, for purposes of argument, that the court's reference was to Jennifer Rodriguez's testimony as plaintiffs contend. (Plaintiffs have raised no issue concerning the testimony of Melanie Rodriguez.)

## C.     Defense Expert Kapelsohn's Testimony

Plaintiffs also contend that defense expert Kapelsohn's testimony should have been excluded as irrelevant and unsupported by the evidence.  Plaintiffs offer the following four reasons for their contention: (1) Kapelsohn's testimony "merely constitute[d] a conclusion of law"; (2) Kapelsohn failed to consider the fact that Walmart made remedial repairs to the ammunition display cases following Garcia's theft of ammunition; (3) Kapelsohn did not consider "sections 30350 and 16850 and Business & Profession Code section 1288.3[, subdivision ](c) in rendering his opinion; and (4) Kapelsohn "did not address or consider the intent [of voters] in approving section 30350[.]"

Given our determinations of the voter intent and the purpose of section 30350, and our determination that the trial court properly excluded evidence of remedial repairs in this matter, plaintiffs have not demonstrated they were harmed by Kapelsohn's testimony.

## D.     The Contention the Trial Court's Decision Endangers Citizens

Plaintiffs contend the trial court's judgment in this matter endangers the citizens of California.  The court is charged with interpreting and following the law.  It does not have the power to legislate.  Plaintiffs' contention is best directed to the Legislatures of this state or the federal government.[18]

---

[18] Plaintiffs' argument that a more robust ammunition display case was necessary to prevent the theft of ammunition might have been a more viable theory of liability had plaintiffs not been barred by the PLCAA from pursuing their general negligence claim.

## DISPOSITION

The judgment in favor of Walmart, Inc. and against plaintiff Laura Soto, in her individual capacity and as guardian ad litem for Rolando Soto, Jr. and Yvette Soto, and plaintiff Klarissa Soto, is affirmed in its entirety.  Walmart, Inc. is entitled to its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)


FAIN, J.*

WE CONCUR:


HILL, P. J.


MEEHAN, J.

---

* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.